[No. S124464. Jan. 30, 2006.]

PACIFIC LUMBER COMPANY et al., Plaintiffs and Respondents, v. STATE WATER RESOURCES CONTROL BOARD, Defendant and Appellant.

## COUNSEL

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Richard M. Frank and Mary E. Hackenbracht, Assistant Attorneys General, and Nicholas Stern, Deputy Attorney General, for Defendant and Appellant.

Law Offices of Sharon E. Duggan and Sharon E. Duggan for Environmental Protection Information Center as Amicus Curiae on behalf of Defendant and Appellant.

Stoel Rives, Morrison & Foerster, Edgar B. Washburn, Christopher J. Carr, William M. Sloan; Carter, Behnke, Oglesby & Bacik, Carter, Oglesby, Momsen & Bacik, John A. Behnke and Frank Shaw Bacik for Plaintiffs and Respondents.

Neil E. Fischer; Barnum & Herman, Thomas M. Herman and William F. Barnum for California Forestry Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

OPINION

**MORENO, J.**—This case addresses whether the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.) and its implementing regulations provide the exclusive mechanism through which the Regional Water Quality Control Boards and the State Water Resources Control Board (collectively, Water Boards) may address water quality concerns implicated by logging operations associated with a timber harvesting plan.

The present dispute arose following the California Department of Forestry and Fire Protection's (Department of Forestry) approval of a timber harvesting plan amendment submitted by Scotia Pacific Company LLC and Pacific Lumber Company (collectively, Pacific Lumber). The North Coast Regional Water Quality Control Board had objected to the amendment, asserting that it contained insufficient safeguards to protect nearby waters potentially affected by the proposed logging activity. This objection was overruled by the Department of Forestry. The Regional Water Quality Control Board and the State Water Resources Control Board then issued orders directing Pacific Lumber to adopt a water quality monitoring program that had not been required by the Department of Forestry. Pacific Lumber asserts that these orders are invalid because the Z'berg-Nejedly Forest Practice Act of 1973 prevents the Water Boards from compelling water quality monitoring related to logging already subject to an approved timber harvesting plan.

Pacific Lumber's construction of the Z'berg-Nejedly Forest Practice Act of 1973 (Forest Practice Act) as providing the exclusive means of regulating timber harvesting is based on public policy, i.e., on a view that the Legislature could not have endorsed an allegedly duplicative and overtaxing regulatory scheme. While it may be the case that a streamlined process would claim certain advantages (and possible disadvantages) relative to a scheme contemplating overlapping jurisdiction, the Forest Practice Act's plain language dictates the result here. Specifically, the Forest Practice Act's savings clause provides that "[n]o provision of this chapter or any ruling, requirement, or policy of the [State Board of Forestry and Fire Protection] is a limitation on . . . [¶] . . . [¶] . . . the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer." (Pub. Resources Code, § 4514, subd. (c).) The Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) specifically authorizes the water quality monitoring ordered by the Water Boards. (See Wat. Code, §§ 13267, subd. (b)(1), 13320, subd. (c).) In light of the Forest Practice Act's *express* disclaimer of any interference with agency responsibilities, and the absence of any irreconcilable conflict between the savings clause and other provisions of the Forest Practice Act, we cannot accept Pacific Lumber's argument that the act *implicitly* allocates to the

Department of Forestry exclusive responsibility for protecting state waters affected by timber harvesting, in derogation of the Water Boards' statutory prerogatives.

As the Court of Appeal reached the same conclusion, we affirm its judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves proposed logging activity on approximately 700 wooded acres in Humboldt County's Elk River watershed. Until 1999, this land was owned by the Elk River Timber Company (Elk River). In 1997, Elk River submitted a timber harvesting plan (THP) as a precursor to logging this area. Under California law, an approved THP is a prerequisite to all nonexempt logging operations. (Pub. Resources Code, § 4581.)[1] The Department of Forestry must review THP's to determine whether they comport with the Forest Practice Act and the rules and regulations of the State Board of Forestry and Fire Protection (Board of Forestry). (§ 4582.7.)

Elk River's THP underwent the multidisciplinary review spelled out in the Forest Practice Act and its associated regulations. (See § 4582.6, subds. (a), (b); Cal. Code Regs., tit. 14, § 1037.5.) The North Coast Regional Water Quality Control Board participated in this process, recommending that Elk River develop a sediment monitoring program along potentially affected waters. Elk River's forester agreed to the concept of a rigorous, cooperative monitoring program. But no mandatory monitoring program was ever written into the THP. The THP provided only that "[m]onitoring protocols, techniques and monitoring locations shall be chosen at the discretion of the landowner or representative." On August 24, 1998, Elk River's THP, known as THP 520, was approved by the Department of Forestry without any objection from the Regional Water Quality Control Board.

THP 520 and the land it encompassed were transferred to Pacific Lumber in 1999. This transaction occurred as part of the "Headwaters Agreement," through which the state gained control of the Headwaters Forest Preserve. (See Stats. 1998, ch. 615.) On August 30, 1999, Pacific Lumber submitted the first of several amendments to THP 520 designed to facilitate logging operations at the site. This proceeding concerns amendment No. 5, which was submitted by Pacific Lumber on September 14, 2000. Amendment No. 5 proposed certain modifications to THP 520, including provisions allowing for wintertime operations, "yarding" (removal of felled timber) by helicopter, and other changes made necessary by the Headwaters Agreement.

---

[1] All subsequent statutory references are to the Public Resources Code unless otherwise noted.

Under the Forest Practice Act, substantial amendments to THP's also are subject to Department of Forestry approval. (§ 4591.) As part of the review process for amendment No. 5, a representative of the North Coast Regional Water Quality Control Board participated in on-site inspections of the THP 520 logging site on November 6, 2000 and November 29, 2000. In January 2001, the chairman of the review team for amendment No. 5 recommended that the Director of the Department of Forestry (Director) approve the amendment. (See Cal. Code Regs., tit. 14, § 1037.5, subd. (c).) Shortly thereafter, as allowed by the California Code of Regulations (*id.*, subd. (e)), the Regional Water Quality Control Board submitted a "non-concurrence" disagreeing with the chairman's recommendation. The Regional Water Quality Control Board's nonconcurrence letter voiced several concerns with the timber harvesting contemplated by the amended THP. Most relevant here, the letter stated that Pacific Lumber had not yet proposed a program that would adequately monitor the effects the harvesting would have on water quality. Without such monitoring, the Regional Water Quality Control Board argued, a chance existed that the timber harvesting authorized by THP 520 would violate state water quality law.[2]

The Department of Forestry rejected the North Coast Regional Water Quality Control Board's concerns regarding inadequate monitoring, stating that the proposed amendment "is anticipated to reduce water quality issues below those in the existing unamended plan. That plan, as noted by [the Regional Water Quality Control Board], is in place and operable without the monitoring program being proposed in this non-concurrence." The Regional Water Quality Control Board's objections having been overruled, the Director approved amendment No. 5 on March 6, 2001.

On March 13, 2001, the North Coast Regional Water Quality Control Board asked the State Water Resources Control Board to invoke the Forest

---

[2] More specifically, the nonconcurrence letter expressed concern that Pacific Lumber's timber harvesting would violate the applicable basin plan. Under state law, "regional boards 'formulate and adopt water quality control plans for all areas within [a] region.' [Citation.] The regional boards' water quality plans, called 'basin plans,' must address the beneficial uses to be protected as well as water quality objectives, and they must establish a program of implementation. [Citation.]" (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619 [26 Cal.Rptr.3d 304, 108 P.3d 862].) The basin plan involved here, excerpts of which we judicially notice upon the State Water Resources Control Board's request (Evid. Code, §§ 452, subd. (c), 459), provides in pertinent part that "[t]he discharge of soil, silt, slash, sawdust, or other organic and earthen material from any logging, construction, or associated activity of whatever nature into any stream or watercourse in the basin in quantities deleterious to fish, wildlife, or other beneficial uses is prohibited," and "[t]he placing or disposal of soil, silt, bark, slash, sawdust, or other organic and earthen material from any logging, construction, or associated activity of whatever nature at locations where such material could pass into any stream or watercourse in the basin in quantities which could be deleterious to fish, wildlife, or other beneficial uses is prohibited." (North Coast Regional Water Quality Control Board, Water Quality Control Plan for the North Coast Region, p. 4-32.)

Practice Act's "head of agency appeal process," which would have allowed the Board of Forestry to review the amendment's approval. (§ 4582.9.) Two days later, the State Water Resources Control Board received a letter from the Director advising the agency that "the amendment and its proposed operations have been sufficiently restricted and mitigated to the point that there is minimal risk to water quality." The State Water Resources Control Board ultimately did not invoke the head of agency appeal process.

Undeterred, the North Coast Regional Water Quality Control Board issued monitoring and reporting order No. R1-2001-19 on March 28, 2001. This order required Pacific Lumber to adopt a comprehensive water quality monitoring program that would include five new monitoring stations along the South Fork of the Elk River. The Regional Water Quality Control Board advised Pacific Lumber that the program was necessary "to assure that discharges from [logging contemplated by THP 520] comply with Basin Plan objectives and prohibitions, to assure that discharges do not impede recovery of the watershed, and to identify and address discharges of sediments to receiving waters in a timely manner."

Pacific Lumber filed a petition (see Wat. Code, § 13320, subd. (a)) with the State Water Resources Control Board, asking it to rescind the North Coast Regional Water Quality Control Board's order. In its petition, Pacific Lumber argued that the Forest Practice Act's provisions relating to THP approval precluded the Regional Water Quality Control Board from imposing monitoring requirements more stringent than those found within the applicable THP. The State Water Resources Control Board disagreed and upheld the Regional Water Quality Control Board's authority to require monitoring. However, the State Water Resources Control Board's final order required only two new monitoring stations, as opposed to the five demanded by the Regional Water Quality Control Board. The State Water Resources Control Board's order also imposed inspection, recordkeeping, reporting, and planning requirements associated with the monitoring.

Pacific Lumber then filed a petition for writ of mandamus in Humboldt County Superior Court. (See Code Civ. Proc., § 1094.5.) In its writ petition, Pacific Lumber argued that the State Water Resources Control Board lacked "authority to unilaterally impose monitoring requirements as a condition to the conduct of timber operations pursuant to an approved THP." Pacific Lumber asserted that the Forest Practice Act conferred upon the Department of Forestry ultimate and exclusive authority to determine whether or not proposed timber operations complied with state water law. Pacific Lumber also contended that the Water Boards were collaterally estopped from revisiting the Department of Forestry's determinations concerning the need for water quality monitoring.

The superior court granted Pacific Lumber's petition. The court concluded that "[t]he legislative history and expressed intent [of the Forest Practice Act] indicates the adoption of a plan to deal with timber harvesting in [a] way that will allow the timberland owner to have finality, once the plan is approved, and appeals exhausted, and yet allow protection of the environment through public input, as well as input from state agencies involved in the timber harvest plan process. Such intent would be vitiated should involved agencies, unhappy with the final plan, ignore the appeal process, and simply issue their own orders to the timberland owner."

The Court of Appeal reversed, relying in great measure on the Forest Practice Act's savings clause, which in relevant part provides that "[n]o provision of this chapter or any ruling, requirement, or policy of the board is a limitation on . . . [¶] . . . [¶] . . . the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer." (§ 4514, subd. (c).) The Court of Appeal determined that "[o]n its face, Public Resource Code section 4514, subdivision (c) directly addresses the interagency issue. It provides that notwithstanding orders of the Department of Forestry (such as the approval of a THP or THP amendment), other state agencies may continue to enforce the laws entrusted to them." The Court of Appeal also rejected Pacific Lumber's collateral estoppel argument and concluded that Pacific Lumber had forfeited, by failing to raise this argument before the superior court, its contention that the monitoring requirements effected a taking of its property without just compensation.

We granted review.

## II. DISCUSSION

Pacific Lumber contends that the Water Boards' unilateral imposition of monitoring requirements subverted the procedures for THP approval incorporated within the Forest Practice Act, which Pacific Lumber characterizes as creating a "one-stop" regulatory process for proposed logging activity that already incorporates detailed consideration of water quality impacts. This "one-stop" process, Pacific Lumber argues, cannot be reconciled with the after-the-fact imposition of additional water quality monitoring requirements by the Water Boards.

The Forest Practice Act promotes a state policy of "encourag[ing] prudent and responsible forest resource management calculated to serve the public's need for timber and other forest products, while giving consideration to the public's need for watershed protection, fisheries and wildlife, and recreational opportunities alike in this and future generations." (§ 4512, subd. (c).) The

Forest Practice Act is designed to "create and maintain an effective and comprehensive system of regulation and use of all timberlands so as to assure that: [¶] (a) Where feasible, the productivity of timberlands is restored, enhanced, and maintained[, and] [¶] (b) The goal of maximum sustained production of high-quality timber products is achieved while giving consideration to values relating to recreation, watershed, wildlife, range and forage, fisheries, regional economic vitality, employment, and aesthetic enjoyment." (§ 4513.)

Toward these goals, the Forest Practice Act requires the Board of Forestry to adopt rules pertaining to the effects of timber operations on water quality and watershed control (§ 4551.5), and rules controlling timber operations that will result or threaten to result in unreasonable effects on the beneficial uses of state waters (§ 4562.7). (See also Cal. Code Regs., tit. 14, §§ 916–916.12.) The Forest Practice Act also contains detailed procedures relating to the submission and approval of THP's. Subject to certain exemptions not implicated here, the Forest Practice Act requires parties who plan on harvesting timber to first submit a THP to the Department of Forestry for approval. (§§ 4581–4582.) The THP must contain information including "[a] description of the land on which the work is proposed to be done," "[a] description of the silvicultural methods to be applied, including the type of logging equipment to be used," "[a]n outline of the methods to be used to avoid excessive accelerated erosion from timber operations to be conducted within the proximity of a stream," "[s]pecial provisions, if any, to protect any unique area within the area of timber operations," "[t]he expected dates of commencement and completion of timber operations," "[a] certification by the registered professional forester preparing the plan that he or she or a designee has personally inspected the plan area," and "[a]ny other information the [Board of Forestry] provides by regulation to meet its rules and the standards of this chapter." (§ 4582, subds. (c)–(i); see also Cal. Code Regs., tit. 14, § 1034.)

Once submitted, the THP is made available for public inspection and comment. (§ 4582.6, subd. (a).) The Department of Forestry transmits copies of the THP to other agencies, including the Department of Fish and Game and the appropriate Regional Water Quality Control Board, for their review. (*Ibid.*) A representative of the local Regional Water Quality Control Board participates in an interagency team that reviews the THP and assists the Director in evaluating the planned timber operations and their environmental impacts. (Cal. Code Regs., tit. 14, § 1037.5.) The review team may perform a preharvest inspection of the proposed logging site. (*Id.*, subd. (g)(1).) The review team's chairperson makes a recommendation to the Director regarding whether the plan should be approved or rejected. (*Id.*, subd. (h).) Any member of the review team may submit a nonconcurrence letter to the Director disagreeing with the chairperson's recommendation to approve a plan and

offering advice on measures or actions that should be taken to address the asserted deficiency. (*Id.*, subd. (e).)

■ The Director then determines whether the THP conforms to the Forest Practice Act and the Board of Forestry's rules and regulations, taking into account the comments and recommendations that he or she has received. (§ 4582.7, subds. (a), (b); Cal. Code Regs., tit. 14, §§ 1037.6–1037.7.) In this respect, the Director, or his or her designee, "shall have the final authority to determine whether a timber harvesting plan is in conformance with the rules and regulations of the [Board of Forestry] and with [the Forest Practice Act] for purposes of approval by the [D]epartment." (§ 4582.7, subd. (e).)[3] Pertinent here, a THP may be rejected if "[i]mplementation of the plan as proposed would cause a violation of any requirement of an applicable water quality control plan adopted or approved by the State Water Resources Control Board." (Cal. Code Regs., tit. 14, § 898.2, subd. (h).)

An applicant whose THP has been disapproved by the Director may request a public hearing before the Board of Forestry, which then determines for itself whether the THP comports with the Forest Practice Act and related regulations. (§ 4582.7, subd. (c).) Conversely, at its option either the State Water Resources Control Board or the Director of Fish and Game may appeal to the Board of Forestry a decision to approve a THP. (§ 4582.9, subd. (a).) Any such appeal must be brought within 10 days of the THP's approval (*ibid.*), and requires prior agency participation in the multidisciplinary THP review process (*id.*, subd. (b)). A hearing on an appeal shall be granted upon a Board of Forestry determination that the appeal raises substantial issues "with respect to the environment or to public safety." (*Id.*, subd. (c).)

Pacific Lumber contends that the foregoing provisions signal an intent to make the THP approval process the exclusive forum for evaluating a proposed timber harvest's effects on water quality. This being the case, Pacific Lumber argues, the Water Boards cannot go outside of this process and unilaterally impose water quality requirements above and beyond those incorporated within an approved THP.

■ There is no dispute that, generally speaking, the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) (Porter-Cologne Act) vests the Water Boards with the authority to require water quality monitoring of the type at issue here. The Porter-Cologne Act seeks "to attain the highest water quality which is reasonable, considering all demands being made and to be

---

[3] The phrase "for purposes of approval by the [D]epartment" was added to section 4582.7, subdivision (e) in 2003, in connection with other changes to the Forest Practice Act that allowed Regional Water Quality Control Boards to instruct the Director to disapprove THP's in certain situations. (See § 4582.71, added by Stats. 2003, ch. 900, § 3.)

made on [state] waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (Wat. Code, § 13000.) The Water Boards are "the principal state agencies with primary responsibility for the coordination and control of water quality." (*Id.*, § 13001.) Under the Porter-Cologne Act, "[a] regional board, in establishing or reviewing any water quality control plan or waste discharge requirements, or in connection with any action relating to any plan or requirement authorized by this division, may investigate the quality of any waters of the state within its region." (*Id.*, § 13267, subd. (a).) In conducting an investigation, a "regional board may require that any person who has discharged, discharges, or is suspected of having discharged or discharging, or who proposes to discharge waste within its region . . . shall furnish, under penalty of perjury, technical or monitoring program reports which the regional board requires." (*Id.*, § 13267, subd. (b)(1).) When reviewing an order issued by a Regional Water Quality Control Board, the State Water Resources Control Board is "vested with all the powers of the regional boards." (*Id.*, § 13320, subd. (c).)

Pacific Lumber's argument is that while the Water Boards may require water quality monitoring as a general matter, the Forest Practice Act displaces their authority in this respect if the monitoring relates to logging activity pursuant to an approved THP. It would be more efficient and sensible, Pacific Lumber contends, to construe the Forest Practice Act's THP approval process as implicitly excluding other means of regulation. If other agencies were allowed to subsequently impose additional requirements on top of those compelled by the Department of Forestry, the argument goes, these agencies will have no incentive to participate in what the Legislature intended to be a "comprehensive" process. Instead, the agencies will subject timber companies to repetitive regulatory review that will increase the costs associated with timber harvesting.

This argument suffers from a fundamental flaw, in that it runs headlong into the Forest Practice Act's savings clause, which provides: "No provision of this chapter or any ruling, requirement, or policy of the [Board of Forestry] is a limitation on any of the following: [¶] (a) On the power of any city or county or city and county to declare, prohibit, and abate nuisances. [¶] (b) On the power of the Attorney General, at the request of the [Board of Forestry], or upon his own motion, to bring an action in the name of the people of the State of California to enjoin any pollution or nuisance. [¶] (c) *On the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer.* [¶] (d) On the right of any person to maintain at any time any appropriate action for relief against any private nuisance as defined in Part 3 (commencing with Section 3479) of Division 4 of the Civil Code or for any other private relief." (§ 4514, italics added.)

As the Court of Appeal ascertained, section 4514, subdivision (c)'s proviso that "[n]o provision of this chapter or any ruling, requirement, or policy of the [Board of Forestry] is a limitation on . . . [¶] . . . [¶] . . . the power of any state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer" is fatal to Pacific Lumber's argument. Pacific Lumber's position boils down to the view that the Forest Practice Act *implicitly* precludes the Water Boards from exercising their authority under the Porter-Cologne Act to impose monitoring requirements, where those requirements relate to timber harvesting undertaken pursuant to an approved THP. Section 4514, subdivision (c) *expressly* provides that the contrary is true, that the Forest Practice Act in no way limits the Water Boards' authority in this respect. As a direct and pellucid expression of legislative intent regarding the precise issue before us, section 4514, subdivision (c) controls the present case.

■ Before the superior court, Pacific Lumber's attorneys contended that section 4514, subdivision (c) applies only in situations where the Forest Practice Act is vague or silent. This interpretation makes no sense; the very purpose of the savings clause is to preserve state agencies' authority as to matters implicated by the Forest Practice Act. Pacific Lumber's construction also ignores the obvious meaning of the directive that "[n]o *provision* of this chapter" will limit the power of a "state agency in the enforcement or administration of any provision of law which it is specifically authorized or required to enforce or administer." (§ 4514, subd. (c), italics added.) We take the phrase "no provision" to mean what it says, that nothing within the Forest Practice Act—including the THP approval and appeal process—implicitly bars the Water Boards from fulfilling their independent obligations. "If there is no ambiguity in the language" of a statute, "we presume the Legislature meant what it said, and the plain meaning of the statute governs." (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 1000 [90 Cal.Rptr.2d 236, 987 P.2d 705].)

Before this court, Pacific Lumber cites three federal decisions that declined to apply generic savings clauses. (*Morales v. Trans World Airlines, Inc.* (1992) 504 U.S. 374, 384–385 [119 L.Ed.2d 157, 112 S.Ct. 2031]; *International Paper Co. v. Ouellette* (1987) 479 U.S. 481, 493 [93 L.Ed.2d 883, 107 S.Ct. 805]; *Matter of Lifschultz Fast Freight Corp.* (7th Cir. 1995) 63 F.3d 621, 625–629.) These decisions are not binding upon our interpretation of the Forest Practice Act, and each is distinguishable. The pertinent savings clause in *International Paper Co. v. Ouellette, supra,* 479 U.S. 481, by its own terms, did not preclude preemption of the supposedly "saved" claims. (*Id.* at p. 493.) Moreover, there the Supreme Court concluded that the savings clause manifested no " 'considered judgment about what other remedies were previously available or continue to be available under any particular statute.' [Citation.]" (*Id.* at p. 494, fn. 14.) In *Morales v. Trans World Airlines, Inc., supra,* 504 U.S. 374, the savings clause could not be reconciled with another

provision of the same law that expressly preempted certain claims. (*Id.* at pp. 384–385.) *Matter of Lifschultz Fast Freight Corp., supra,* 63 F.3d 621, addressed an ambiguous savings clause, one interpretation of which would have rendered other provisions of the same law superfluous; in interpreting the clause, the court observed that "when we are forced to choose between specific statutory provisions and a general savings clause, we err on the side of the specific provisions in the belief that they reflect congressional intent more clearly. [Citation.] Absent a clearly expressed intention contrary to those more specific provisions, [citation], we simply cannot 'believe Congress intended to undermine this carefully drawn statute through a general savings clause,' [citation], consistent with our duty to 'make sense rather than nonsense of the corpus juris.' [Citation.]" (*Id.* at p. 629.)

This case, of course, does not implicate the full spectrum of considerations that may be present where federal legislation contains a savings clause. Moreover, as pertinent here the cases cited by Pacific Lumber and other decisions addressing savings clauses in federal legislation (see, e.g., *Geier v. American Honda Motor Co., Inc.* (2000) 529 U.S. 861, 867–874 [146 L.Ed.2d 914, 120 S.Ct. 1913]; *American Telephone and Telegraph Co. v. Central Office Telephone, Inc.* (1998) 524 U.S. 214, 227–228 [141 L.Ed.2d 222, 118 S.Ct. 1956]) merely establish a reluctance to construe a savings clause such that it conflicts with other, more specific provisions of a law or " 'upset[s] [a] careful regulatory scheme established by federal law' " (*Geier v. American Honda Motor Co., Inc., supra,* 529 U.S. at p. 870; see also *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 924–926 [12 Cal.Rptr.3d 262, 88 P.3d 1] [discussing *Geier*]). This principle is both unexceptional and inapplicable, for section 4514, subdivision (c) can be harmonized with the other provisions of the Forest Practice Act. (See *Wells v. Marina City Properties, Inc.* (1981) 29 Cal.3d 781, 788 [176 Cal.Rptr. 104, 632 P.2d 217] [wherever possible, legislation should be construed so as to harmonize and give meaning to its various elements].) The savings clause can be read as consistent with—and indeed, a vital part of—a regulatory scheme that encourages interagency teamwork in the THP approval process by providing forums for collaboration and the airing of any disagreements that may arise, but not at the cost of stripping state agencies of their respective authority to protect resources that may be affected by logging.

None of the terms of the Forest Practice Act that Pacific Lumber relies upon compels a contrary conclusion, for we perceive no irreconcilable conflict between any of these provisions and the Forest Practice Act's savings clause. While Pacific Lumber stresses that under the Forest Practice Act the Director "shall have the final authority to determine whether a timber harvesting plan is in conformance with the rules and regulations of the [Board of Forestry] and with [the Forest Practice Act]" (§ 4582.7, subd. (e)), this provision does not necessarily disturb the authority of *other* agencies to

enforce laws *other* than the Forest Practice Act.[4] There is no inherent conflict between giving the Director final authority over the approval of THP's while at the same time preserving other state agencies' jurisdiction over the effects of timber harvesting on state resources under their purview. This approach simply creates a system of overlapping jurisdiction, an uncontroversial concept under our law even absent a savings clause like the one implicated here. (See, e.g., *State Personnel Bd. v. Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 439–441 [217 Cal.Rptr. 16, 703 P.2d 354] [concluding that the Department of Fair Employment and Housing, the Fair Employment and Housing Commission, and the State Personnel Board shared concurrent jurisdiction over disciplinary actions and examinations involving state civil service employees]; *Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945, 953–954 [95 Cal.Rptr. 17, 484 P.2d 1361] [recognizing the concurrent jurisdiction of the Public Utilities Commission and air pollution control districts]; cf. *Resource Inv., Inc. v. U.S. Army Corps of Eng'rs* (9th Cir. 1998) 151 F.3d 1162, 1169 [finding no concurrent jurisdiction between federal agencies in a situation where no interagency savings clause was involved].) Being subject to regulation by both the Department of Forestry (to the extent Pacific Lumber proposed timber harvesting) and the Water Boards (to the extent this harvesting implicated the state's water resources and the Water Boards' authority under the Porter-Cologne Act), Pacific Lumber was bound to comply with the more stringent monitoring requirements imposed by the State Water Resources Control Board. (See *Orange County Air Pollution Control Dist. v. Public Util. Com., supra,* 4 Cal.3d at pp. 953–954; 37 Ops.Cal.Atty.Gen. 31, 36 (1961).)[5]

---

[4] Section 4582.7's language regarding the Director's "final authority" was added to the statute in 1995. (Stats. 1995, ch. 612, § 3, p. 4590.) Just five days prior to oral argument in this matter, and several months after the completion of briefing, Pacific Lumber filed a request asking this court to take judicial notice of several legislative and executive analyses and reports pertaining to this amendment. Pacific Lumber did not adequately explain why the request was filed so late, and we deny the request. (See Evid. Code, § 453, subd. (a).)

[5] We are not faced here with a situation in which it would be literally impossible for a timber harvester to simultaneously comply with conflicting directives issued by the Department of Forestry and the Water Boards. We trust that agencies strive to avoid such conflicts, and express no opinion here regarding the appropriate outcome in a case involving irreconcilable orders. (Cf. *State Personnel Bd. v. Fair Employment & Housing Com., supra,* 39 Cal.3d at p. 442, fn. 20 [noting that "any conflicts which may arise in this area can be resolved either by administrative accommodation between the two agencies themselves or, failing that, by sensitive application of evolving judicial principles"].) On this topic, the State Water Resources Control Board has requested judicial notice, as an official act by executive agencies (Evid. Code, § 452, subd. (c)), of a memorandum of understanding between Regional Water Quality Control Boards, the Department of Forestry, and itself executed in 2003. This memorandum sets forth procedures aimed at resolving interagency conflicts within the THP review process, and additionally provides that where the Department of Forestry and the Water Boards disagree, the Water Boards "may proceed to take whatever action they believe is appropriate under their independent statutory authority." (Mem. Between State Water Resources Control Board, Designated Regional Water Quality Control Boards, and Cal. Dept. of Forestry and Fire

Likewise, we perceive no inherent inconsistency between a system allowing for concurrent jurisdiction and the Legislature's avowed desire to "create and maintain an effective and comprehensive system of regulation and use of all timberlands." (§ 4513.) "Comprehensive" means, among other things, "[i]ncluding much; comprising many things; having a wide scope; inclusive." (Webster's New Internat. Dict. (2d ed. 1941) p. 550.) The creation of an "inclusive" means of timber management does not necessarily mandate the abolition of other methods of regulation. At oral argument, counsel for Pacific Lumber effectively conceded as much, acknowledging that the Water Boards *could* regulate the effects of timber harvesting on water resources if "changed circumstances" following approval of a THP so required.

Pacific Lumber also urges reversal on the ground that if the Water Boards are free to unilaterally impose monitoring requirements not included in a THP, they will have no incentive to participate in the head of agency appeal procedure authorized by section 4582.9. Pacific Lumber's position presumes an irrationally antagonistic relationship among the agencies participating in THP reviews. From the State Water Resources Control Board's perspective, a head of agency appeal oftentimes may be preferable to issuing orders under the agency's independent authority. The appeal process provides for prompt review of a THP approval[6] and, if the Board of Forestry agrees with the objector, allows the appealing agency to avoid the effort and expense that would be associated with issuing its own orders on the subject. A voluntary appeal process therefore can be understood as consistent with a policy of calling upon agencies to cooperatively evaluate the environmental impacts of a proposed timber harvest, while allowing these agencies to act on their own in situations where they cannot agree.[7]

---

Protection, p. 10.) We grant this request. (Evid. Code, §§ 452, subd. (c), 459; see also *Brown v. City of Los Angeles* (2002) 102 Cal.App.4th 155, 172, fn. 10 [125 Cal.Rptr.2d 474]; *Dunn-Edwards Corp. v. South Coast Air Quality Management Dist.* (1993) 19 Cal.App.4th 536, 543, fn. 3 [24 Cal.Rptr.2d 99].)

[6] The Board of Forestry must conduct a public hearing on a head of agency appeal within 30 days after an appeal is filed, or a longer period mutually agreed upon by the Board of Forestry, the appealing agency, and the THP submitter. The Board of Forestry must approve or deny the challenged THP within 10 days after the conclusion of the hearing. (§ 4582.9, subd. (d).)

[7] Pacific Lumber also relies upon a passage from an enrolled bill report for Senate Bill No. 1568, the measure that added the head of agency appeal to the Forest Practice Act. The report states, "In recent court cases involving THPs the agencies have been pitted against each other to the disadvantage of the state. An administrative hearing on an appeal would forestall such tactics." (Dept. of Forestry, Enrolled Bill Rep. on Sen. Bill No. 1568 (1989–1990 Reg. Sess.) Sept. 1, 1989, p. 1.) Pacific Lumber suggests that this language reflects an intent to channel all interagency disputes through the THP process. Even assuming that the report affords some insight into the Legislature's intent (see *Elsner v. Uveges* (2004) 34 Cal.4th 915, 934, fn. 19 [22 Cal.Rptr.3d 530, 102 P.3d 915]), the excerpted language appears only to reflect a desire to lessen the need for court action by providing aggrieved agencies with the option of

The Forest Practice Act's legislative history also distinguishes this case from those in which savings clauses were trumped by inconsistent provisions of a statute. (See, e.g., *International Paper Co. v. Ouellette, supra,* 479 U.S. at p. 494, fn. 14.) Assembly member Edwin Z'berg, the author of Assembly Bill No. 227 (1973–1974 Reg. Sess.), which would become the Forest Practice Act, wrote the Legislative Counsel for an opinion in advance of the bill's passage. The State Water Resources Control Board and the Department of Fish and Game had voiced concerns regarding Assembly Bill No. 227's proposed section 4562.7, which confers upon the Board of Forestry authority to promulgate rules regarding, among other subjects, the control of timber operations that result or threaten to result in unreasonable effects on the beneficial uses of state waters. The agencies feared that this provision, and rules promulgated thereunder, might be construed as superseding their own authority. Assembly member Z'berg wrote the Legislative Counsel with his view that the language of proposed section 4514, subdivision (c) "would seem to allow the [State Water Resources Control Board] and the Regional Water Quality Control Boards to continue regulation of waste discharges from logging activities, including soil, bark, and other debris, whenever they affect water quality." (Assembly Member Edwin L. Z'Berg, letter to Legislative Counsel regarding Assem. Bill No. 227 (1973–1974 Reg. Sess.) Aug. 6, 1973.) However, out of concern that "the specific language of Section 4562.7 might be considered by the courts to be such a clear expression of the Legislature as to the scope of regulations to be applied to logging that the State Board of Forestry rules would be considered paramount," he requested an opinion answering the following question: "Will AB 227 in any way limit the jurisdiction or restrict the enforcement activities of the [State Water Resources Control Board], the Regional Water Quality Control Boards or the Department of Fish and Game?" (*Ibid.*)

The Legislative Counsel responded in the negative: "Although the conduct of a timber operation may be subject also to the rules, regulations, and orders of other state agencies, there is nothing in the provisions of proposed Section 4562.7 which would provide that the rules adopted pursuant to that section are to supersede, be paramount to, or control over applicable rules, regulations, or orders of other state agencies. On the contrary, subdivision (c) of proposed Section 4514 specifically declares that no provision of proposed Chapter 8 (commencing with Section 4511) of Part 2 of Division 4, of which proposed Section 4562.7 is a part, or any ruling, requirement, or policy of the new State Board of Forestry, is a limitation on the power of any state agency in the enforcement or administration of any provision of law which it is specifically

---

an administrative appeal. It does not suggest that the Legislature intended for the THP approval process to provide the exclusive means of addressing the environmental impacts of timber harvesting.

authorized or required to enforce or administer." (Ops. Cal. Legis. Counsel, No. 16456 (Aug. 10, 1973) Forestry (Assem. Bill No. 227) p. 3.)

■ Opinions of the Legislative Counsel, though not binding, are entitled to great weight when courts attempt to discern legislative intent. (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 17 [270 Cal.Rptr. 796, 793 P.2d 2].) Here, the Legislative Counsel's opinion recognized that the Forest Practice Act allows for overlapping agency jurisdiction in situations where timber harvesting also affects water resources. The legislative record thus establishes that the implications of section 4514, subdivision (c) were fully appreciated at the outset, and further demonstrates that the savings clause's plain language controls this case.

Pacific Lumber's other arguments also fail to persuade. The company purports to find support for its position in the Porter-Cologne Act's savings clause, Water Code section 13002. In certain respects, the language of Water Code section 13002 resembles that of section 4514. Water Code section 13002, subdivision (d) provides that "[n]o provision of this division or any ruling of the state board or a regional board is a limitation . . . [¶] . . . [¶] . . . [o]n the power of a state agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer." Pacific Lumber argues that the Water Boards' actions here have limited the Department of Forestry's ability to regulate timber harvesting under the Forest Practice Act, contrary to the language quoted *ante.*

■ Like Pacific Lumber's other arguments, this contention takes the untenable position that the "power" delegated by the Forest Practice Act to the Department of Forestry includes the *exclusive* authority to determine whether and how various environmental laws should apply to proposed timber harvesting activities. On the contrary, as relevant here, the Department of Forestry's power relates to the decision whether or not to approve a THP. The Water Board's orders did not limit the Department of Forestry's authority in this respect. At the same time, the Forest Practice Act's savings clause establishes that while THP approval is an essential step in the timber harvesting process, it is not necessarily the only regulatory hurdle a harvester must overcome. The Water Boards' orders signify their considered judgment that, regardless of whether a THP has been approved under the Forest Practice Act, under the Porter-Cologne Act a monitoring program also is appropriate. As previously established, the Department of Forestry's powers do not extend so far as to preclude sister agencies from regulating conduct that intrudes into their own spheres of authority. There was no violation of the Porter-Cologne Act's savings clause.

■ Pacific Lumber also points to the Legislature's 2003 enactment of section 4582.71, which provides that a THP "may not be approved if the

appropriate regional water quality control board finds, based on substantial evidence, that the timber operations proposed in the plan will result in a discharge into a watercourse that has been classified as impaired due to sediment pursuant to subsection (d) of Section 303 of the Federal Water Pollution Control Act, that causes or contributes, to a violation of the regional water quality control plan." (§ 4582.71, subd. (a).) Section 4582.71 does not apply directly to this case; both THP 520 and amendment No. 5 were approved long before the passage of Senate Bill No. 810, which added this section to the Forest Practice Act. Rather, Pacific Lumber ascribes significance to section 4582.71 as a reiteration of the Legislature's purported long-standing desire to have water quality issues addressed exclusively within the THP approval process. (Cf. *West Pico Furniture Co. v. Pacific Finance Loans* (1970) 2 Cal.3d 594, 610 [86 Cal.Rptr. 793, 469 P.2d 665] [later enactments may offer some insight into the legislative intent behind previously enacted laws].) We have already determined that no such intent informed the Forest Practice Act, and section 4582.71 does not alter this conclusion. "[A]n expression of legislative intent in a later enactment is not binding upon a court in its construction of an earlier enacted statute, [although] it is a factor that may be considered." (*Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 492 [30 Cal.Rptr.3d 823, 115 P.3d 98].) Here, even if we were to assume for purposes of argument that, in allowing Regional Water Quality Control Boards to command the rejection of THP's, section 4582.71 also opaquely expresses a preference that the THP approval process be exhaustive,[8] any insight into the enacting Legislature's intent gleaned from this assumption would pale before the evident purport of section 4514, subdivision (c). (See *County of Sonoma v. State Bd. of Equalization* (1987) 195 Cal.App.3d 982, 992 [241 Cal.Rptr. 215]; *Honey Springs Homeowners Assn. v. Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1137 [203 Cal.Rptr. 886].)[9]

---

[8] However, a legislative analysis of Senate Bill No. 810 remarked upon the Water Boards' authority over water quality issues relating to timber harvesting, observing that "[r]egional boards have various enforcement possibilities under Porter-Cologne as violations of basin plans become evident, but this bill would enhance their role at the beginning of the approval process." (Sen. Rules Com., Analysis of Sen. Bill No. 810 (2003–2004 Reg. Sess.) May 6, 2003, p. 2.) Another analysis of Senate Bill No. 810 commented, "[the State Water Resources Control Board] contends that there are no costs to either [the State Water Resources Control Board] or [the Regional Water Quality Control Boards] because the bill codifies current practices and does not explicitly require a [Regional Water Quality Control Board] to participate in the THP approval process to any greater extent than it does now." (Sen. Rules Com., Analysis of Sen. Bill. No. 810 (2003–2004 Reg. Sess.) Sept. 9, 2003, p. 4.)

[9] Pacific Lumber also asserts that provisions of the Timberland Productivity Act of 1982, Government Code section 51100 et seq., support its view that the Water Boards lack authority to impose monitoring requirements exceeding those incorporated within a THP. Pacific Lumber specifically points to the Timberland Productivity Act's declaration that the state's policy is to "[e]ncourage investment in timberlands based on reasonable expectation of harvest" (*id.*, § 51102, subd. (a)(4)), and provisions relating to local or nuisance-related restrictions on

Contrary to Pacific Lumber's argument that amendments to the Forest Practice Act have robbed the savings clause of its evident meaning, at least one such amendment has implicitly reaffirmed that the Department of Forestry and the Water Boards possess overlapping jurisdiction in situations where timber harvesting affects water resources. In 1979 the Legislature added section 4514.3, subdivision (a) to the Forest Practice Act. Section 4514.3, subdivision (a) exempts "[t]imber operations conducted pursuant to [the Forest Practice Act] . . . from the waste discharge requirements of Article 4 (commencing with Section 13260) of Chapter 4 of Division 7 of the Water Code" if "both [the Environmental Protection Agency] and the State Water Resources Control Board certify . . . that the provisions of [the Forest Practice Act] constitute best management practices for silviculture pursuant to Section 208 of the Federal Water Pollution Control Act." As the Court of Appeal noted, section 4514.3 "demonstrates that the Legislature knows how to specify that timber operations are exempt from other laws when it so intends." Moreover, this exemption would be unnecessary if, as Pacific Lumber argues, THP approval prevents the Water Boards from subsequently regulating the effects of timber operations on water quality.[10]

The legislative history of section 4514.3 also works against Pacific Lumber's position. In explaining the statute, the Legislative Counsel reiterated the earlier-expressed view that rules and regulations promulgated under the Forest Practice Act "do not supersede or control over any rules, regulations, or orders of the State Water Resources Control Board or of a regional board." (Legis. Counsel's Dig., Sen. Bill No. 667 (1979–1980 Reg. Sess.) 4 Stats 1979, Summary Dig., p. 203.) Similarly, an enrolled bill report relating to this measure explained: "[The] rules and regulations [promulgated under the Forest Practice Act] do not supersede rules or regulations established by the State Water Resources Control Board or of a regional board. In effect, timber operations are subject to the provisions of regulations administered by both the State Board of Forestry and the State and regional water quality control boards

---

timber operations (*id.*, §§ 51102, subd. (b), 51115.5). We do not perceive in any of these provisions meaningful support for the position that the Forest Practice Act, notwithstanding its savings clause, prohibits state agencies specifically entrusted with the coordination and control of water quality from fulfilling their statutory obligations insofar as they relate to timber operations.

[10] Of similar import is Water Code, section 13269, subdivision (a) (as amended by Stats. 2003, ch. 801, § 1), which allows the Water Boards to issue waivers from certain waste discharge requirements. Subdivision (a)(4)(D) of Water Code section 13269 specifically recognizes that silviculture operations are eligible for these waivers. If the Legislature had intended for the Forest Practice Act's THP approval procedures to trump the Water Boards' authority to regulate timber harvesting, there would be no reason for the Porter-Cologne Act to discuss these waivers for logging operations.

although the two departments work closely together to avoid duplication." (Dept. of Finance, Enrolled Bill Rep. on Sen. Bill No. 667 (1979–1980 Reg. Sess.) Sept. 13, 1979, p. 1.)

Section 4514.3, subdivision (a) also helps defeat Pacific Lumber's more nuanced contention, emphasized at oral argument, that while the Forest Practice Act might allow the Water Boards to regulate the effects of timber harvesting on water resources when circumstances change after the commencement of logging (as when it becomes clear that the protective provisions within a THP are inadequate), the Water Boards cannot impose additional requirements *before* any logging has begun, as they did here. The provisions of the Porter-Cologne Act referenced by section 4514.3 include sections contemplating the Water Boards' regulation of both existing and *proposed* discharges of waste. (See, e.g., Wat. Code, §§ 13260, subd. (a), 13263, subd. (a).) By implicitly recognizing the applicability of these provisions to timber operations (absent an exemption), section 4514.3, subdivision (a) also acknowledges the Water Boards' authority to regulate timber harvesting outside of the THP approval process even before logging has commenced. Furthermore, Pacific Lumber's position finds no support in the Forest Practice Act's savings clause, which contains no language limiting its applicability to situations when "changed circumstances" force an agency's hand. Nor does Pacific Lumber's argument provide any guidance regarding when circumstances would have "changed" sufficiently to allow for agency intervention. Also, to the extent that Pacific Lumber's various contentions seek to minimize the cost and expense of logging, it would seem counterproductive to delay agencies from acting, or imposing prophylactic measures, until such time as logging has begun, at which point a timber harvester already may have made a significant investment of time and money.

■ Finally, Pacific Lumber invokes two canons of statutory construction. First, "[a]s a principle of construction, it is well established that a specific provision prevails over a general one relating to the same subject." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (1999) 71 Cal.App.4th 1518, 1524 [84 Cal.Rptr.2d 621].) The second canon invoked by Pacific Lumber, the doctrine of implied repeal, applies " '[w]hen two or more statutes . . . concern the same subject matter and are in irreconcilable conflict . . . .' [Citation.] In such cases, 'the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature, and thus to the extent of the conflict impliedly repeals the other enactment.' [Citation.]" (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 568 [71 Cal.Rptr.2d 731, 950 P.2d 1086].) Neither interpretive rule assists Pacific Lumber here. The former doctrine only applies

when an irreconcilable conflict exists between the general and specific provisions (*People v. Price* (1991) 1 Cal.4th 324, 385 [3 Cal.Rptr.2d 106, 821 P.2d 610]; *Medical Board v. Superior Court* (2001) 88 Cal.App.4th 1001, 1013–1014 [106 Cal.Rptr.2d 381]); the latter, when the two acts are " ' " 'irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together.' " ' [Citation.]" (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, *supra*, 17 Cal.4th at p. 569.) As previously discussed, there are no irreconcilable conflicts here, either within the Forest Practice Act as originally enacted, or between the savings clause and later amendments to the law.[11]

All in all, Pacific Lumber makes several reasonable arguments suggesting that a "one stop" process for THP approval might have some beneficial aspects, at least from the timber harvester's point of view. But there are also valid reasons to allow for concurrent jurisdiction among various regulatory agencies. The Forest Practice Act's savings clause, read in context, expresses a clear preference for the latter approach, and we are not free to substitute a contrary judgment for the Legislature's considered conclusions.

In a variation on the theme developed by the foregoing arguments, Pacific Lumber asserts that, in this particular matter, the Water Boards were collaterally estopped from imposing water quality monitoring requirements not included within THP 520, because the Department of Forestry already had determined that mandatory water quality monitoring was unnecessary.

 "Collateral estoppel precludes relitigation of issues argued and decided in prior proceedings." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].) The doctrine applies "only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.] The party asserting collateral estoppel bears the burden of establishing these requirements." (*Id.* at p. 341.) "Even assuming all the threshold requirements are satisfied, however,

---

[11] Pacific Lumber also argues that the State Water Resources Control Board's actions raise "serious constitutional concerns" because they "would allow timberland owners to be deprived of the only use they can make of their lands." This assertion references and relies upon Pacific Lumber's argument that the Water Boards' actions resulted in an uncompensated taking of their property. (See U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) As discussed *post*, Pacific Lumber has forfeited this claim by failing to develop it before the trial court. There are no "serious constitutional concerns" involved in this appeal.

our analysis is not at an end. We have repeatedly looked to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting." (*Id.* at pp. 342–343.)

■ We have recognized that "[c]ollateral estoppel may be applied to decisions made by administrative agencies." (*People v. Sims* (1982) 32 Cal.3d 468, 479 [186 Cal.Rptr. 77, 651 P.2d 321].) For an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character. (*Ibid.*) Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision. (*Id.* at p. 480.)

Collateral estoppel does not apply here. As it pertains to the Water Boards, the interagency THP review and approval process does not possess a judicial character.[12] The Court of Appeal accurately observed that the process lacks many of the indicia of proceedings imbued with a judicial character, such as an opportunity to call and cross-examine witnesses. (See *People v. Sims, supra,* 32 Cal.3d at p. 480.) More fundamentally, the North Coast Regional Water Quality Control Board's principal role in the review of THP 520 and amendment No. 5 was to provide input on significant issues relating to water quality. We are unaware of any California decisions finding a basis for collateral estoppel in similarly consultative participation in an essentially collaborative process, and Pacific Lumber cites to none. The Department of

---

[12] Pacific Lumber claims that opinions concluding that the Director's decision whether to approve a THP is subject to writ review under Code of Civil Procedure section 1094.5 (see, e.g., *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1392 [61 Cal.Rptr.2d 297]) demonstrate that this approval decision is quasi-judicial for collateral estoppel purposes. The discussions Pacific Lumber draws upon were concerned with whether section 1085 or section 1094.5 of the Code of Civil Procedure provided the appropriate avenue of writ review following the approval of a THP. As the Court of Appeal below concluded, these decisions provide little guidance in the instant context. As pertinent here, that an administrative decision is deemed amenable to review under Code of Civil Procedure section 1094.5, by itself, establishes only that the decision "involved the application of 'a rule . . . to a specific set of existing facts.' " (*People v. Sims, supra,* 32 Cal.3d at p. 480; see also *Patterson v. Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 840–841 [130 Cal.Rptr. 169].) Though this is a factor to be considered in determining whether an administrative decision was quasi-judicial for collateral estoppel purposes (*People v. Sims, supra,* 32 Cal.3d at p. 480), it is not conclusive (see *Mahon v. Safeco Title Ins. Co.* (1988) 199 Cal.App.3d 616, 622 [245 Cal.Rptr. 103]), and to the extent it applies here it is outweighed by the countervailing considerations discussed *ante.*

Forestry's decision to approve amendment No. 5 therefore did not bar the Water Boards' monitoring orders under collateral estoppel principles.[13]

■ Our decision not to apply the doctrine of collateral estoppel also rests on a second, related ground. "[A] court may not give preclusive effect to the decision in a prior proceeding if doing so is contrary to the intent of the legislative body that established the proceeding in which res judicata or collateral estoppel is urged." (*Brosterhous v. State Bar* (1995) 12 Cal.4th 315, 326 [48 Cal.Rptr.2d 87, 906 P.2d 1242].) Such is the case here. Granting collateral estoppel effect to the Department of Forestry's decisions, to the extent it would allow the Department of Forestry's conclusions to prevail over the contrary views of other agencies acting within the scope of their respective statutory authority, essentially would read section 4514, subdivision (c) out of the Forest Practice Act. The THP process is designed to give the Department of Forestry the benefit of the Regional Water Quality Control Boards' expertise through nonadversarial consultation. Section 4514, subdivision (c) establishes that participation in this process will not prevent the Water Boards from taking additional measures deemed necessary to protect water quality. Finding collateral estoppel applicable would undermine the intended nature of the THP review process by compelling agencies such as the Water Boards to sharply contest every disputed matter, or attempt to withdraw entirely from the process, for fear of having subsequent enforcement efforts blocked by a Department of Forestry finding. These considerations provide an additional basis upon which to conclude that collateral estoppel does not apply here.[14]

---

[13] Pacific Lumber asserts that in deciding whether the Water Boards are collaterally estopped, we must take into account the procedures, including the right to call witnesses, that are implicated when the State Water Resources Control Board appeals the approval of a THP to the Board of Forestry. (See § 4582.9, subd. (d) [discussing appeal procedures].) No such appeal was taken here. Pacific Lumber refers to only one decision for the proposition that a reviewing court must consider procedures available in appeal proceedings that were not utilized when determining whether an administrative determination was quasi-judicial for collateral estoppel purposes. This decision, *Plaine v. McCabe* (9th Cir. 1986) 797 F.2d 713, does not support Pacific Lumber's position, for it addressed whether a quasi-judicial administrative decision *loses* its collateral estoppel effect when a party fails to seek judicial review—an issue that arises from almost the precise opposite of the situation involved here. (*Id.* at p. 719, fn. 12.) In any event, even if the procedures involved with a head of agency appeal had to be taken into account, and assuming further that these additional procedures imbued the THP approval proceedings and decision with a quasi-judicial import, as stated in the text *ante*, we would still decline to afford collateral estoppel effect to the Department of Forestry's decision because doing so would deviate from the aims and terms of the Forest Practice Act.

[14] Because we reject Pacific Lumber's collateral estoppel argument on the above two grounds, we need not determine whether Pacific Lumber has satisfied its burden of establishing the other elements of collateral estoppel. We also decline to entertain Pacific Lumber's takings claim. (See U.S. Const., 5th Amend.; Cal. Const., art. I, § 19.) We agree with the Court of Appeal's conclusion that Pacific Lumber has forfeited this claim by failing to develop it before the trial court. Competent evaluation of this argument would require consideration of numerous

## III. Disposition

We affirm the judgment of the Court of Appeal.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Bamattre-Manoukian, J.,* concurred.

contested facts, making it inappropriate for an appellate court to take up the issue in the first instance. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 221, fn. 15 [188 Cal.Rptr. 115, 655 P.2d 317].)

*Associate Justice, Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.