[No. A130469. First Dist., Div. Three. Dec. 9, 2011.]

ESTEBAN ALLENDE et al., Plaintiffs and Appellants, v.
DEPARTMENT OF THE CALIFORNIA HIGHWAY PATROL, Defendant
and Appellant.

COUNSEL

S. Chandler Visher, Matthew J. Witteman and Bradley C. Arnold for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Fiel D. Tigno and William T. Darden, Deputy Attorneys General, for Defendant and Appellant.

OPINION

**POLLAK, J.**—The Department of the California Highway Patrol (CHP) appeals from a judgment declaring invalid and enjoining enforcement of certain provisions of its policy for recovering emergency response costs from persons causing incidents while driving under the influence of alcohol or drugs. We conclude that the CHP's policy is not inconsistent with the language or purpose of the authorizing legislation, Government Code section 53150 et seq.[1] and, therefore, shall reverse the judgment.

### Background

In this court's decision reviewing an earlier order in this litigation, we summarized: "Sections 53150 through 53159 establish the statutory framework allowing public agencies to recover emergency response expenses from persons who intentionally or negligently cause incidents requiring an emergency response. Section 53150 defines the circumstances under which a person driving a motor vehicle may be liable for the expense of an emergency response, and section 53156, subdivision (a) . . . defines 'expense of an emergency response.' " (*California Highway Patrol v. Superior Court* (2006) 135 Cal.App.4th 488, 497 [38 Cal.Rptr.3d 16] (*Allende I*).)[2]

This action began in November 2003 when Esteban Allende and Michelle Grundhoeffer filed a complaint alleging that under the CHP's emergency

---

[1] All statutory references are to the Government Code unless otherwise noted.

[2] Section 53150 provides: "Any person who is under the influence of an alcoholic beverage or any drug, or the combined influence of an alcoholic beverage and any drug, whose negligent operation of a motor vehicle caused by that influence proximately causes any incident resulting in an appropriate emergency response, and any person whose intentionally wrongful conduct proximately causes any incident resulting in an appropriate emergency response, is liable for the expense of an emergency response by a public agency to the incident."

Section 53156, subdivision (a) defines "expense of an emergency response" as "reasonable costs incurred by a public agency in reasonably making an appropriate emergency response to the incident, but shall only include those costs directly arising because of the response to the particular incident. Reasonable costs shall include the costs of providing police, firefighting, rescue, and emergency medical services at the scene of the incident, as well as the salaries of the personnel responding to the incident."

response cost billing policy, drivers were being charged for costs not authorized by the statute. Following the entry of an order summarily adjudicating issues in favor of the two plaintiffs, this court issued a writ of mandate reversing that order and deciding primarily two issues. First, addressing the meaning of an "incident" as used but not defined in the statute, we concluded that "an 'incident' is any event that proximately causes an emergency response by a public agency. Although an accident is not necessary to trigger the right to reimbursement, an ordinary arrest, even for driving under the influence of alcohol or drugs, is not sufficient." (*Allende I, supra,* 135 Cal.App.4th at p. 502.) Second, we concluded that "the trial court erred when it excluded from the 'expense of an emergency response' in section 53156(a) the costs of activities related to enforcement of the DUI laws. An 'appropriate emergency response' to an incident includes the cost of providing police services at the scene, including, among other possible items, salary costs related to ensuring public safety at the scene of the incident, obtaining appropriate medical assistance, removing vehicles, investigating the cause of the incident, conducting field sobriety tests, and if appropriate arresting and detaining the subject. [¶] Reimbursement may also be obtained for time spent away from the scene by responding public agency personnel, provided the response is reasonable and arises from the incident." (*Allende I, supra,* at pp. 508–509.) However, "[t]ime spent by responding personnel on activities that are not customarily required as a consequence of investigating and mitigating a DUI incident is not eligible for reimbursement. Thus, salary costs incurred after a subject is booked and required reports prepared are not recoverable as expenses of an emergency response." (*Id.* at p. 509.)

Following issuance of the opinion in *Allende I,* the CHP modified its policy defining the circumstances under which reimbursement of emergency response costs would be demanded. When the original complaint was filed, the CHP policy provided that cost recovery would be sought only following the arrest of a driver under the influence of alcohol or drugs who had caused an accident. Shortly after the decision in *Allende I,* the Highway Patrol Manual (HPM) was revised to, inter alia, delete the limitation of cost recovery to situations involving an accident (HPM, § 11.1, ch. 20, § 3(b)(3) (Nov. 2002 rev.)) and to insert the requirement that "[t]he arrested party was determined by the investigating officer to have caused a response to an incident." (HPM, § 11.1, ch. 20, § 3(b)(2) (Aug. 2006 rev.).)[3] A "Management Information Systems Communications Network" (COMNET) message was distributed to

---

[3] The revised manual states: "The Department will seek to recover DUI incident-related costs for alcohol or a combination of alcohol and drugs provided all of the following apply: [¶] (1) An arrest was made for a violation of California Vehicle Code (CVC) Sections 23152, 23153, or a greater offense involving alcohol and/or drugs. [¶] (2) The arrested party was determined by the investigating officer to have caused a response to an incident." (HPM, § 11.1, ch. 20, § 3(b) (Aug. 2006 rev.).) Other qualifications to the cost recovery program are

all commands on April 20, 2006, clarifying that henceforth "the department shall seek cost recovery for every DUI related emergency response resulting in an arrest." The message gave three "examples of DUI incidents resulting in arrest in which the department would seek cost recovery: [¶] response to a party slumped over the wheel; [¶] response to a report of a possible 23152 V.C. driver; [and] [¶] response to a disabled vehicle when the arrest is in accordance with 40300.5(b) V.C." The directive also provided that cost recovery should not be sought "when an incident is encountered during normal patrol duties." On December 7, 2006, "to clarify policy" the department distributed another COMNET directive to all commands, stating that the CHP "will seek cost recovery for any incident in which an officer is dispatched to a call resulting in a DUI arrest of a driver with a supporting blood alcohol concentration."[4]

In their second amended complaint, filed after remand, plaintiffs allege that the revised CHP policy defines an "incident" justifying cost recovery more broadly than permitted by the statute as interpreted in our prior opinion. The amended complaint adds a new plaintiff, Steven Kurashima, who was billed under the CHP's amended policy and who sought to represent a subclass of persons billed "for the costs of their DUI arrests in cases where there has been no emergency response to an 'incident.' " The amended complaint also challenges the department's policy in a second respect, alleging that the CHP improperly calculates an officer's salary for the purpose of cost recovery under section 53156 by including the cost of benefits in addition to the wages paid directly to the officer and by overstating the number of hours allocated to the response to an incident.

In granting a subsequent motion for summary adjudication by Kurashima and Grundhoeffer, the trial court held that the CHP's amended policy is not consistent with the definition of an "incident" under section 51350 as interpreted in *Allende I.* The court explained that the CHP's policy authorizes billing for all incidents in which an officer was dispatched to the scene rather than only those incidents that resulted in an emergency response. The court relied on "undisputed evidence . . . that not all dispatches are emergency dispatches that call for an 'appropriate emergency response.' " With respect to Kurashima's individual claim the court stated, "The undisputed facts are

included in the manual but are not relevant to the issues on appeal. For example, a conviction must be obtained in certain circumstances before demanding cost recovery. (HPM, 11.1, *supra*, ch. 20, § 3(d).)

[4] This directive gives as "examples of incidents resulting in arrest in which the department would seek cost recovery" the following: "Dispatched to a call for service, e.g., vehicle blocking roadway, disabled motorist, party slumped over wheel, involving a DUI driver. [¶] Dispatched to a traffic collision resulting in a DUI arrest of a driver determined to have caused the collision." This message also states that the CHP "will not seek cost recovery from any incident, including a traffic collision, which an officer encountered on patrol."

that the responding officer was dispatched because CHP received a call from a private citizen about a disabled vehicle at the side of the road. Under the CHP's dispatch system, a vehicle off the side of the road would be a Priority 3 dispatch rating and the responding officer would respond in the normal flow of traffic and without lights or siren. The record suggests that the CHP dispatched the responding officer with a Priority 3 dispatch rating and that the responding officer responded in the normal flow of traffic and without lights or siren. Nothing suggests that the responding officer actually responded on an emergency basis. The law does not suggest that the CHP can respond to an incident on an non-emergency basis and then, on arrival, deem the incident to require an emergency response." (Fns. omitted.)

In a subsequent order, the court reiterated that "[t]he undisputed evidence shows that the CHP's Incident Policy is overbroad in that it permits assessment of a charge under [section] 53150 even when a dispatch was not triggered by an appropriate emergency response." In the final judgment entered on November 19, 2010, the court incorporated its prior ruling on the declaratory relief claims as follows: "[T]he court declares that the CHP violated the law in the following respects: (a) it treated as 'incidents' within the meaning of section 53150 events when officers were dispatched to a location regardless of whether the officer was dispatched on an emergency basis and without regard to whether the event included a collision or other 'incident' within the meaning of the statute, leaving determination thereof to the responding officer . . . ." The court entered a permanent injunction prohibiting the CHP "from sending notice of any emergency response expenses it intends to collect pursuant to section 53150 except in the following limited circumstances: [¶] . . . [¶] (c) A collision has occurred as a result of the negligent operation of a motor vehicle caused by the driver being under the influence of an alcoholic beverage or drug; provided that defendant CHP may apply for a modification of this judgment to include other qualifying incidents after demonstrating to the court a reasonable basis for distinguishing incidents, such as collisions, from non-incidents, such as simply arresting a driver on DUI charges."

The issues concerning the proper calculation of an officer's salary were decided based on stipulated facts. According to the stipulation, the CHP calculates the standard hourly rate for a traffic officer each year by taking the monetary wages paid to a midstep traffic officer, adding to that amount the cost of benefits, including retirement contributions, health insurance, workers' compensation and Medicare, and dividing that amount by an officer's total actual working time, which includes the hours an average officer works after subtracting paid time off for holidays, vacations and other leave.

In ruling on the motion for summary adjudication, the trial court rejected this approach. The court concluded that "[t]he term 'salaries' is limited to

monetary compensation and does not include the cost of benefits." The court explained, "As an exception to the general rule that limits recoverable costs to 'those costs directly arising because of the response to the particular incident,' the term salaries should be read narrowly so as not to swallow the rule." The court also held that the hourly rate should be calculated based on a standard work week without regard to whether employees are actually working or are on some form of paid time off.

In the final judgment the court incorporated its prior ruling on this issue as follows: "[T]he court declares that the CHP violated the law in the following respects: . . . (b) it calculated 'salary' for purposes of . . . section 53156(a) improperly by (1) including benefits earned by responding officers providing an 'appropriate emergency response' in addition to the value of the time reasonably spent responding; and (2) calculating the hourly rate to be charged by dividing the total annual salary plus benefits of a mid-step CHP officer by the average number of hours worked per fiscal year. The result of the CHP policy was to wrongly assess incorrect charges . . . ." The court's permanent injunction prohibits the CHP from sending notice of any emergency response expense it intends to collect unless "(a) The salary of responding officers is correctly calculated in accordance with the judgment by calculating the appropriate hourly rate using a fraction with the numerator corresponding to the 'salary of responding officers' for the hours worked (i.e., 'not including . . . compensation for hours paid but not worked') divided by the denominator, corresponding to the 'mid-step officer's average hours actually worked' as follows: [¶] 1. The numerator 'salary of responding officers' is the mid-step officer's salary (which does not include overtime pay and the cost of benefits) less all compensation for hours paid but not worked; [¶] 2. The denominator, 'mid-step officer's average hours actually worked,' is the average of all hours for which a mid-step officer is paid (not including overtime hours) less those hours paid but not worked. [¶] (b) The expenses sought to be recovered are limited to those incurred providing 'an appropriate emergency response.'"

The CHP filed a timely notice of appeal.[5]

---

[5] Following summary adjudication of the substantive issues, the court certified a class and a subclass of plaintiffs. The first, referred to as the "Fixed Cost Class," was defined to include all persons who were sent a cost bill by the CHP pursuant to section 53150 or who paid a cost bill that was sent pursuant to section 53150 on or after July 17, 2002, and before the date of notice to the class. The subclass, referred to as the "Incident Subclass," was defined to include " '[a]ll persons in the Fixed Cost Class whose DUI arrest was after April 20, 2006, and who did not cause an accident according to defendant's database.' " Although granting summary adjudication of the underlying substantive issues, the court found that triable issues of fact precluded summary adjudication of plaintiffs' claims for restitution. On August 26, 2010, following a multiday bench trial, the court issued a partial judgment in favor of the CHP with respect to the remaining claims by the Fixed Cost Class. The court held that the common law doctrine of

## Discussion

1. *The CHP has not defined an "incident" too broadly.*

■ The CHP disputes the trial court's determination that its revised policy defining those situations in which cost recovery may be obtained is overly broad because it includes situations in which there was no emergency response. As set forth more fully above, the policy as articulated in the HPM does not purport to define an "incident" but requires the investigating officer to determine that the arrested driver "caused a response to an incident." In clarifying its policy, the department has stated its revised policy to be that the department will seek cost recovery "for every DUI related emergency response resulting in an arrest" and, as restated most recently, "for any incident in which an officer is dispatched to a call resulting in a DUI arrest of a driver." Seizing on this final articulation, plaintiffs argue, and the trial court agreed, that since officers may be dispatched in nonemergency situations, the department's policy sanctions cost recovery under circumstances not authorized by the statute. As pointed out above, section 53150 authorizes the CHP to seek cost recovery from a DUI (driving under the influence) driver who "proximately causes any incident resulting in an appropriate emergency response." And in *Allende I* we concluded that "as used in section 53150, an 'incident' is any event that proximately causes an emergency response by a public agency." (*Allende I, supra,* 135 Cal.App.4th at p. 502.) Referring to the specifics of Mr. Kurashima's claim, the trial court concluded that since in response to a report of a disabled vehicle on the side of the road an officer was dispatched on a priority 3 basis, there was no emergency response justifying cost recovery.

The CHP's policy undoubtedly focuses first on whether the situation deemed to be an incident originates from a dispatch rather than routine patrol. This limitation conforms with the explicit holding in *Allende I* that the arrest of a drunk driver resulting from a routine traffic stop does not constitute an emergency or an incident. (*Allende I, supra,* 135 Cal.App.4th at p. 499.) Conditioning cost recovery on the dispatch of an officer ensures that the costs to be recovered are incremental costs incurred in response to a specific event. And while officers may under other circumstances be dispatched in nonemergency situations, the department's view is that when a dispatch is triggered by a person driving under the influence of alcohol or drugs, the situation in

---

voluntary payment and the statutory basis of governmental immunity preclude members of the Fixed Cost Class from recovering monetary relief for any overpayment. Shortly thereafter, the court concluded that these defenses also apply to the claims for monetary relief by members of the Incidents Subclass. Plaintiffs have cross-appealed from these rulings, but in light of the conclusions we reach with respect to the underlying issues on the CHP's appeal, we do not reach the issues presented in the cross-appeal.

virtually all circumstances is an emergency, whether or not recognized as such at the time of the dispatch. Moreover, under the department's policy the ultimate determination (subject to internal review, as discussed below) is left to the discretion of the responding officer. As the CHP suggests, the policy "correctly permits billing when the officer on-scene determines that he or she responded to an incident—such as a wrong way driver, a driver slumped over the wheel, a BOL [('be on the lookout')] for a drunk driver, a vehicle blocking the roadway—caused by the intoxicated person, as such situations inherently present a grave risk to the driver and other persons and are necessarily categorized as emergency responses."

In *Allende I*, we noted that the "Vehicle Code defines 'emergency response situation' in one context to mean 'instances in which necessary measures are needed in order to prevent injury or death to persons or to prevent, confine, or mitigate damage or destruction to property.' (Veh. Code, § 23116, subd. (e).)" (*Allende I, supra*, 135 Cal.App.4th at p. 499.) We also observed that "[s]ituations such as the abandonment of a vehicle on railroad tracks, unlike a traffic stop or an arrest at a DUI checkpoint, may involve an emergency response to prevent harm to persons or property and require more of a peace officer's time and attention than the typical enforcement of the DUI laws." (*Id.* at p. 500.) The dictionary defines an emergency as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" or "an urgent need for assistance or relief." (<http://www.merriam-webster.com/dictionary/emergency> [as of Dec. 9, 2011].) The CHP's interpretation of an emergency thus falls well within the recognized meaning of the term.

Declarations submitted by CHP representatives confirm the reasonableness of this interpretation. For example, according to an assistant chief, "CHP officers operate in a freeway environment that presents unique risks to the public and to responding officers. The nature of a freeway environment means that passing vehicles are likely driving at high speeds that presents a serious risk of injury or death resulting from any anomalous situation on the roadway including but not limited to a vehicle blocking a lane, a vehicle driving erratically, or even a vehicle on the shoulder. I am aware of many situations in which vehicles (including patrol cars) parked on or off the freeway shoulder have been struck from behind by motorists traveling on the freeway, resulting in injury and death. I am aware of many situations in which pedestrians on or off the freeway shoulder have been struck by motorists traveling on the freeway, resulting in injury and death. . . . [¶] Trained officers recognize that calls such as a 'Be on the Lookout' ('BOL') for an impaired driver present a potentially dire emergency situation. Impaired drivers kill and injure themselves and others with alarming frequency. Unlike a situation where an officer directly observes the impaired driver while on patrol and can effect an emergency stop as soon as possible, a

'BOL' presents a situation where an officer, sometimes miles from the reported scene, knows that every minute that passes between the moment the call is broadcast and the moment he or she locates the vehicle, presents a risk of death or injury and the call requires as urgent a response as conditions permit. . . . Sometimes the driver may be reported to be weaving, sometimes the driver may have been reported to have almost hit other vehicles, and sometimes—in a situation of grievous danger—an impaired driver may be driving the wrong way on the freeway. Regardless, any officer responding to such a call is responding to a potential emergency that requires an urgent response. [¶] While vehicles blocking the roadway present an obvious serious risk of traffic collisions, experienced officers know that even vehicles reported to be on the side of the highway present a potential serious risk of danger. Even a vehicle off to the side of a freeway lane can present a real hazard . . . . Similarly, a call of a driver slumped over the wheel or passed out carries a grave risk; the driver could be suffering from a medical emergency or, if impaired, any undue delay in getting to the scene means that the driver could rouse from his or her slumber and enter the roadway, presenting a risk of death or injury. All of these situations present potential risks of injury or death."

While an emergency response requires a degree of urgency, the CHP has also explained why the existence of an emergency cannot be ascertained from the priority that the dispatcher assigns to a dispatch or to whether the officer responded using red lights and a siren. The priority assigned by the dispatcher to a particular dispatch normally reflects only information received from an anonymous caller, which may be inaccurate, and determines only the sequence of responses to pending calls for assistance. According to the assistant chief, "The dispatcher does *not* communicate to the responding officer any priority code or order regarding how the officer must respond to any given call . . . . The dispatcher communicates only the type of call to the responding units, and the officer . . . will use his or her training and experience in deciding how and in what way to respond. [¶] . . . [¶] The officer decides, based upon his or her judgment, training and experience, how best to respond in order to protect public safety, taking into consideration, for example, the nature of the call and his or her distance from the scene. An officer's judgment, training and experience dictates the speed of his or her response to the call and whether or not lights and sirens are used; on occasion, a trained officer may decide that use of lights and siren may actually be counterproductive to the fastest response to a scene, because of the unpredictable nature of the response of other drivers to the emergency lights and siren."

The record thus provides a reasonable explanation for the pragmatic approach that the CHP has adopted in determining those incidents in which cost recovery will be demanded, and ample justification for its expansive interpretation of what constitutes an emergency response. Viewed from this

perspective, the situation underlying the Kurashima claim, which the trial court did not consider to involve an emergency response, is properly considered as such because of the need for prompt action to reduce the risk of injury, despite the fact that the officer responded without lights or siren.

A sample of 376 reports from DUI arrests not involving a two-car collision, which plaintiffs submitted in support of their motion for class certification, supports the same conclusion. According to plaintiff's calculations, 94 percent of the those arrests did not involve incidents that qualify for cost recovery, but the DUI arrest reports that plaintiffs presented as representative of cases in which cost recovery billing assertedly was improper disprove this contention. Initially, plaintiffs acknowledge that two instances were properly characterized as incidents giving rise to emergency responses: a dispatched call reporting a car driving the wrong way on the freeway and another reporting a vehicle parked on railroad tracks. The other incidents, which plaintiffs claim were mischaracterized, reflect no less need for swift intervention. In the first, officers were advised to be on the lookout for a possible DUI driver swerving on the roadway; as the patrol car approached, the car swerved approximately four to five feet off the roadway to avoid an approaching ambulance, then swerved back onto the road crossing the double yellow line several times until the officers were able to conduct an emergency stop. In another, an officer was dispatched to the scene of a solo vehicle collision and found the car stuck in a ditch on the side of the highway where the inebriated driver, then standing outside the car, had been spinning her wheels attempting to reenter the highway. In a third, an officer responded to a report of a disabled vehicle parked in a traffic lane on the highway at 2:16 a.m. In still another, officers were dispatched on a report of a car with a flat tire that was blocking the roadway at night. Finally, in another, an officer was dispatched to be on the lookout for a DUI driver with an open container that led to an emergency stop. These examples, selected by plaintiffs, fail to demonstrate any basis for disagreeing with the assessment that each required immediate action and involved an emergency response. Indeed, they demonstrate precisely the opposite.

Moreover, it is worth noting that the CHP has instituted an internal appeal process under which arrested drivers may challenge an officer's initial determination that an incident qualifies for cost recovery. According to the evidence, "when [the CHP] send[s] out an Emergency Response Cost invoice under the CHP's Cost Recovery Program, and disputes arise over the propriety of the invoice, [it] has established procedures for investigating, reviewing, and resolving such disputes . . . ." For example, if "the dispute involves a contention . . . that no emergency response to an incident was involved, [the CHP] will put the invoice on hold and forward a copy of the invoice file (including the dispute letter) to the area office from which the incident arose. Information is requested from the area office so that an

appropriate response can be made. If it is determined that the invoice was mistakenly issued, [the CHP] will cancel the invoice and inform the disputant of that fact. If the area office believes the invoice was properly issued and the disputant does not agree, or if the contention involves a dispute regarding the Government Code, the matter may be referred to the CHP's legal office. The CHP's counsel will then review the materials. When the CHP's counsel concludes an invoice was not appropriate, the charges are cancelled."

 The record before us thus demonstrates the wisdom of deferring to the CHP's expertise. When a statutory provision is ambiguous and there is no clear case or other persuasive authority on the subject, the statute's contemporaneous construction by the administrative agency charged with enforcing it is entitled to great weight, unless it is clearly erroneous or unauthorized. (*McGraw v. Department of Motor Vehicles* (1985) 165 Cal.App.3d 490, 493 [211 Cal.Rptr. 620]; accord, *Woosley v. State of California* (1992) 3 Cal.4th 758, 776 [13 Cal.Rptr.2d 30, 838 P.2d 758].) "Deference to administrative interpretations always is 'situational' and depends on 'a complex of factors' [citation], but where the agency has special expertise and its decision is carefully considered by senior agency officials, that decision is entitled to correspondingly greater weight . . . ." (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 436 [2 Cal.Rptr.3d 699, 73 P.3d 554], citing *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12–15 [78 Cal.Rptr.2d 1, 960 P.2d 1031]; see also *Styne v. Stevens* (2001) 26 Cal.4th 42, 53 [109 Cal.Rptr.2d 14, 26 P.3d 343] [administrator's "interpretation of a statute he is charged with enforcing deserves substantial weight"].) In *Allende I*, we observed, "Ultimately, the court's task is to interpret the statute in a manner that is not only consistent with its language, legislative history and purpose, but that is also workable and reasonable in practice." (*Allende I, supra*, 135 Cal.App.4th at p. 507.) As we recognized in our prior decision, practical considerations weigh heavily in favor of approving the CHP's interpretation of an incident under section 53150. The record before us fails to establish that the department is abusing its authority in the manner in which it has interpreted and is applying the limitation of cost recovery to incidents involving an emergency response.

### 2. *The CHP's method of calculating recoverable costs of police services is consistent with the statute.*

 Section 53156, subdivision (a) authorizes the recovery of "reasonable costs incurred by a public agency in reasonably making an appropriate emergency response to the incident, but shall only include those costs *directly*

*arising* because of the response to the particular incident. Reasonable costs shall include the costs of providing police, firefighting, rescue, and emergency medical services at the scene of the incident, as well as the salaries of the personnel responding to the incident." (Italics added.) Plaintiffs contend, and the trial court agreed, that the CHP overcharges DUI drivers by including in the computation of an officer's salary the cost of benefits, and by misallocating officers' salaries to fewer hours than the total hours for which the officer is paid, thereby increasing the hourly cost of the officers' time devoted to an incident. We disagree.

The CHP calculates an officer's salary based on the procedures set out in the State Administrative Manual (SAM) sections 8752, 8752.1 and 8740. SAM section 8752 states the policy of the state that all departments "recover full costs" except where a statute expressly prohibits full cost recovery.[6] SAM section 8752.1 categorizes cost elements into direct costs, indirect or overhead costs and central service costs. As applicable here, under section 8752.1, an officer's salary, including benefits, is categorized as a direct cost: "Department direct costs are those which can be identified specifically with a particular cost objective, such as: [¶] a. Personal services costs incurred in meeting the cost objective (*personal services costs will include the fringe benefit factors prescribed in SAM Section 8740*)." (Italics added.)[7] SAM section 8740 provides the formula for determining hourly rates of salaried employees. The hourly billing rate includes the cost of benefits.[8] In conformity with these sections, the CHP calculates annually a standard hourly rate for its officers by taking the monetary wages paid to a midstep traffic officer,

---

[6] SAM section 8752 provides in relevant part, "The state policy is for departments to recover full costs whenever goods or services are provided for others [citation]. This policy, which applies to all departments regardless of funding sources, is to be followed in all cases except where statutes prohibit full cost recovery."

[7] Under SAM section 8752.1, "department direct costs" also include "Operating expenses and equipment costs incurred in meeting the cost objective, such as the cost of contracts, travel expenses, etc." The section defines "department indirect (overhead) costs" as those costs "which benefit more than one cost objective/organizational unit" that "include: [¶] a. Personal services costs of unit, bureau, division, and department administrative, supervisory, and executive staff. [¶] b. Personal services costs of support units, including clerical support, housekeeping, etc. [¶] c. Operating expenses and equipment costs not included as part of department direct costs. [¶] 3. Central service costs are costs incurred by central service departments (e.g., Department of Finance, State Controller's Office, State Personnel Board, etc.) for the benefit of state departments."

[8] SAM section 8740, entitled "Billing for Services of Employees Paid on a Monthly Basis" (boldface & some capitalization omitted), provides the following formula for determining hourly rates when departments bill for services of employees paid on a monthly basis: "(Monthly Salary Rate x [the annual state benefit contribution percentage]) divided by [¶] ('Total Actual Working Time per Year' divided by 12)." Under section 8740 the state benefit contribution percentage may include the state contribution for employee's retirement, disability insurance, Medicare, health, vision and dental benefits as well as workers' compensation, industrial disability, unemployment compensation, and life insurance benefits.

adding the cost of benefits (retirement contributions, health insurance, workers' compensation and Medicare contributions) and dividing that amount by an officer's "total actual working time," which includes the total number of hours an average officer works after subtracting paid time off for holidays, vacations and other leave.

The trial court concluded that despite conformity with the SAM, the inclusion of benefit costs in the calculation of an officer's salary, and the exclusion of vacation, sick time and other paid leave from the average annual hours worked, is inconsistent with section 53156. Based on its reading of section 53156 and the legislative history discussed in *Allende I*, the court held that benefit costs may not be recovered.[9] The court reasoned that benefit costs, like personnel salaries, are "fixed costs" and that while the statute provides an express exception for salaries to the general rule that fixed costs are not recoverable, no similar exception is provided for benefit costs.

■ We do not read the language of section 53156 so narrowly. As noted above, under section 8752 of the SAM, the CHP is required to seek full cost recovery except as expressly limited by statute. Section 8752 of the SAM defines "full cost recovery" to include "all costs attributable directly to the activity plus a fair share of indirect costs which can be ascribed reasonably to the good or service provided." Because section 53156 limits recovery to costs directly arising from an emergency response, the CHP properly excludes indirect costs that otherwise would be recoverable under the SAM. However, the cost of fringe benefits unquestionably is a direct personnel cost and, as provided in the SAM, is included in the hourly billing rate. Whether or not considered part of the officer's "salary," the cost of benefits is part of "the costs of providing police . . . services" within the meaning of section 53156. The exclusion of this cost would defeat the objective of full cost recovery and is not required by a reasonable interpretation of section 53156.

The trial court also held that the formula prescribed in the SAM for calculating "total actual working time" is not applicable to cost recovery

---

[9] In *Allende I*, we discussed the legislative history of section 53156 as follows: "In 1986, when the Legislature increased the liability limit from $500 to $1,000, it also amended section 53156(a) to add the sentence explicitly including within the definition of the expense of an emergency response the salaries of personnel responding to the incident. (Stats. 1986, ch. 1112, § 2, p. 3908; Assem. Com on Judiciary, Analysis of Sen. Bill No. 1699 (1985–1986 Reg. Sess.) as amended Apr. 28, 1986, p. 2.) Before the amendment, it was understood that only overtime pay was recoverable as an emergency response cost because the statute did not authorize recovery of fixed costs. (Ops. Cal. Legis. Counsel, No. 9207 (May 9, 1986) Emergency Services; Assem. Com on Judiciary, Analysis of Sen. Bill No. 1699 (1985–1986 Reg. Sess.) as amended Apr. 28, 1986, p. 2.) The legislative analysis of the 1986 amendment makes clear that the language permitting recovery of costs 'directly arising' because of the response to the incident was intended to clarify that, with the exception of salaries, a public agency's fixed costs do not qualify for reimbursement." (*Allende I, supra*, 135 Cal.App.4th at p. 505.)

under section 53156 because those provisions "appear[] to concern the state's internal accounting procedures." Relying instead on title 8, section 11040, subdivision 3(A)(1)(c) of the California Code of Regulations, the trial court found that "[t]he customary calculation in California for determining the hourly rates of nonexempt full-time salaried employees is 'by using the employee's regular hourly salary as one-fortieth (1/40) of the employee's weekly salary.' " The court did note that this calculation would need to be adjusted because an officer's standard work week is 42.5 hours. The court reasoned that the Legislature was "presumably aware of how the [Division of Labor Standards Enforcement] requires employers to reduce salaries to hourly rates and expected the CHP to use a similar methodology." While the court recognized that the Legislature presumably was also aware of the SAM, the court found "no indication that [the Legislature] intended to permit law enforcement agencies to depart from common usage when charging members of the public under [section] 53156."

We disagree with this analysis. The trial court's suggestion that the SAM formula is not applicable to external cost recovery billing is not supported by the manual. SAM section 8752 states the policy for cost recovery "whenever goods or services are provided for *others*." (Italics added.) For internal purposes there is a different section, SAM section 8758, entitled "Charges for interagency services" (boldface & some capitalization omitted).[10]

■ More importantly, because the statute does not require a specific formula to be utilized, it falls within the CHP's discretion to select a formula that is consistent with the language and intent of the statute. As we noted in *Allende I*, "Because the CHP is the state agency with the most expertise in conducting DUI-related accident investigations, it is in the best position to determine the appropriate components of an emergency response. Its consistent and long-standing interpretation of what constitutes a reimbursable emergency response expense under section 53156(a) is therefore entitled to deference." (*Allende I, supra*, 135 Cal.App.4th at p. 503.) The CHP's method for calculating its emergency response costs, and its decision to follow the procedures specified in the SAM, is similarly entitled to deference. There is nothing in section 53156 that expressly or by implication precludes the method of calculation that the CHP utilizes. There is, therefore, no basis for requiring the CHP to use a different method of calculating or allocating an officer's salary in determining its emergency response costs.

---

[10] SAM section 8758 provides that "Charges for interagency services will include the same cost components that are included in charges for services to other than state agencies, i.e., direct costs, indirect costs, and central service costs, as prescribed in Section 8752."

## Disposition

The judgment entered in favor of plaintiffs on their claims for declaratory and injunctive relief is reversed. The CHP shall recover its costs on appeal.

McGuiness, P. J., and Siggins, J., concurred.

A petition for a rehearing was denied January 5, 2012, and the petition of plaintiffs and appellants for review by the Supreme Court was denied March 21, 2012, S199460. Corrigan, J., did not participate therein.