FRANSON, J.
*876 Appellant Caltec Ag, Inc. (Caltec) challenges a final administrative decision of the California Department of Pesticide Regulation (Department or DPR) that three of Caltec's products were pesticides. Pursuant to Food and Agricultural Code sections 12993 and 12999.4,[1] the Department imposed fines totaling $784,000, finding that the products should have been registered as pesticides before being sold in California.
California's statutory scheme for the regulation of pesticides defines "pesticide" to include (1) any "spray adjuvant," (2) any mixture of substances intended to be used *159 for regulating plant growth, and (3) any substance used to prevent, destroy, repel or mitigate any pest. (§ 12753.) Here, the Department determined products named "Greenfeed 27-0-0" and "Terra Treat" were spray adjuvants and a product named "Kelpak," a liquid extract from edible seaweed, was intended to be used as a plant growth regulator. Prior to the Department's determinations, the California Department of Food and Agriculture (DeptAg) had issued certificates registering the products as specific types of "fertilizing materials." (§ 14533.) Greenfeed 27-0-0 was registered as a "commercial fertilizer" (§ 14522), Terra Treat as an "auxiliary soil and plant substance" (§ 14513), and Kelpak as an "organic input material" (§ 14550.5). Thus, Caltec contends the products were fertilizers and not pesticides.
As to Greenfeed 27-0-0, we conclude substantial evidence supports the finding that this commercial fertilizer is also a spray adjuvant. A Caltec document states Greenfeed 27-0-0 is compatible with pesticides other than sulfur, has excellent sticking and spreading qualities, and can be used as a carrier for pesticides. The document supports a finding that Greenfeed 27-0-0 is a spreading agent intended to be used with another pesticide as an aid to the application of the other pesticide. Consequently, Greenfeed 27-0-0 satisfies the definition of a spray adjuvant. (§ 12758.)
Substantial evidence also supports the findings that Terra Treat is a spray adjuvant-specifically, a wetting agent that aids the application of pesticides. Terra Treat's label described it as a soil surfactant/penetrant designed to uniformly distribute fertilizer, pesticides and water throughout the root zone.
*877 Also, a May 2011 technical information sheet states Terra Treat significantly increases the effectiveness of certain insecticides and herbicides. Based on these and other documents in the record, the Department's finding that Terra Treat is a spray adjuvant and, therefore, a pesticide under section 12753 is supported by substantial evidence.
As to Kelpak, substantial evidence supports the findings that (1) Kelpak is a liquid auxin concentrate, (2) naturally occurring auxins in concentrated form are plant growth regulators, and (3) Caltec sold Kelpak with the intent that it be used as a plant growth regulator. Accordingly, the Department did not commit factual error in determining Kelpak is a plant growth regulator and, therefore, a pesticide under section 12753.
As to the questions of statutory construction involving the relationship between the chapter of the Food and Agricultural Code governing pesticides and the chapter governing fertilizers, we conclude the DeptAg's prior registration of Terra Treat as an "auxiliary soil and plant substance" (§ 14513) and Kelpak as an "organic input material" (§ 14550.5) does not preclude the Department from determining those products were pesticides.
Caltec also has raised claims of procedural and evidentiary error. We conclude any procedural error was not prejudicial and Caltec has failed to demonstrate the hearing officer's treatment of the evidence violated an applicable rule of law.
We therefore affirm the judgment.
FACTS AND PROCEEDINGS
Caltec markets and sells a variety of agricultural plant nutrients, crop protectors and chemicals. In December 2012, the Department received an email from a licensed pest control advisor stating that a product named Microlife was being actively promoted and sold as a nematicide by Caltec even though Microlife was not registered as a pesticide. The email attached *160 copies of labels used by the companies selling the product.[2]
On the morning of May 30, 2013, the Department issued a "NOTICE OF INSPECTION" to Caltec for its office in Modesto. The inspector was Saiful Chowdhury, who works as an environmental scientist in the Department's product compliance branch. Chowdhury spoke with Caltec's office manager who informed him no products were located at the corporate office in Modesto and customers took possession of the materials they ordered at *878 Caltec's warehouse in Fresno. The office manager provided Chowdhury with copies of labels for the products sold and a guide manual for Kelpak. After reviewing the documents, Chowdhury issued "PESTICIDE STATUTES VIOLATION NOTICE[S]" relating to four products that were not registered as pesticides with the Department. The products were Microlife, Greenfeed 27-0-0, Terra Treat, and Kelpak. The notices (1) stated the Department's opinion that the products were pesticides that required registration, (2) advised Caltec it was illegal to sell unregistered pesticides in California, and (3) noted Caltec had refused to provide sales invoices for the products.
On June 17, 2013, counsel for Caltec responded to the violation notices by sending the Department a letter stating (1) Greenfeed was a fertilizer, (2) Terra Treat was a soil penetrant used in irrigation to prevent puddling and to promote lateral movement of water in soil, and (3) "Kelpak is a natural plant growth regulator made out of sea weed and is used to increase the set and quality of fruits and vegetables." The letter stated Caltec's position that the products were not pesticides and asserted the products were not intended to control or destroy pests. The letter requested the withdrawal of the violation notices.
The Department did not withdraw the violation notices and continued its attempts to obtain sales information for the products. Meanwhile, in November 2013, Chowdhury completed an investigation summary using the Department's preprinted form. The investigation summary concluded Microlife, Greenfeed, Terra Treat and Kelpak were pesticides. Exhibits to the investigation summary included (1) documents obtained from Caltec's Web site, (2) a September 13, 2012, press release from the United States Environmental Protection Agency (EPA), (3) a Kelpak label received from Caltec's owner, (4) documents from the Web site of Kelpak's manufacturer, and (5) the June 17, 2013, letter from Caltec's counsel.
In December 2013, the Department again requested sales information for the products by sending Caltec's owner a letter. Counsel for Caltec responded in a letter dated January 13, 2014, which asserted the products were fertilizers, not pesticides, and refused to provide the sales data.
On May 29, 2014, after failing to obtain sales information through less formal means, the Department issued an administrative subpoena duces tecum to Caltec for all invoices, bills of lading, receipts and other documents evidencing the sale of Microlife, Greenfeed, Terra Treat and Kelpak in California from June 1, 2010, to June 1, 2014. In October 2014, Caltec finally produced its sales invoices.
*879 Notice of Violations
On January 29, 2015, the Department issued a notice of proposed action to levy civil penalties under section 12999.4 (Notice of Proposed Action). The Department alleged Caltec violated section 12993 by *161 selling Microlife (17 sales), Greenfeed (133 sales), Terra Treat (7 sales), and Kelpak (282 sales) in California when those products were not registered as pesticides. The Department proposed levying a civil penalty totaling $789,000. The Notice of Proposed Action stated Caltec could contest the proposed action by requesting a hearing no later than 20 days after its receipt of the notice. A form for requesting a hearing was attached.
Administrative Proceedings and Decision
On February 19, 2015, Caltec requested a hearing. The next day-a Friday-the Department sent Caltec a notice of hearing stating the hearing would begin on Thursday, March 12, 2015, and proposed ongoing hearing dates of the next three business days. Caltec's appellate briefing represents Caltec received the notice of hearing on February 25, 2015, a Wednesday.[3] Additional details about the procedural steps in the administrative process leading to the Department's decision are provided in the chronology of events set forth in part II.A.3., post .
On July 14, 2015, after various procedural steps were completed, including the hearing itself, the hearing officer submitted a proposed decision to the Department. The proposed decision set forth the statutory definitions of pesticide (§ 12753), spray adjuvant (§ 12758), pest (§ 12754.5), and regulating plant growth (§ 12756) and the regulatory definition of the phrase "intended to be used" ( Cal. Code Regs., tit. 3, § 6145 (Regulation 6145) ). The proposed decision stated (1) Microlife was intended to suppress nematodes,[4] (2) Greenfeed was a spray adjuvant, (3) Terra Treat was a spray adjuvant, and (4) Kelpak was a liquid auxin concentrate sold as a plant growth regulator. As a result, the proposed decision concluded the four products were pesticides and recommended a penalty totaling $939,000 for 438 sales of unregistered pesticides. The unregistered sales had generated proceeds of approximately $5,168,000 and, therefore, the proposed fine equaled about 18.2 percent of the sales revenue.
On July 17, 2015, the director of the Department, Brian Leahy (Director), issued a decision and order adopting the findings in the proposed decision *880 and amending the per violation penalties, which reduced the total fine to $784,000. The proposed decision as modified and adopted by the Director is referred to as the "Decision" in this opinion.
Administrative Mandamus Proceedings
In August 2015, Caltec filed a petition for writ of administrative mandamus pursuant to Food and Agricultural Code section 12999.4 and Code of Civil Procedure section 1094.5. In December 2015, Caltec filed an amended petition.
After briefing, a hearing on the writ petition, and a hearing on objections to the superior court's statement of decision, the court denied the petition. In September 2016, the superior court signed and filed an amended statement of decision and amended judgment implementing its decision to deny Caltec's petition for writ of administrative mandamus. Caltec filed a timely notice of appeal challenging the final judgment.
*162 DISCUSSION
I. GENERAL PRINCIPLES
A. Standard of Review
Decisions of the Director are subject to judicial review pursuant to section 1094.5 of the Code of Civil Procedure, which governs administrative mandamus. ( § 12999.4, subd. (c).) When conducting such a review, the court's inquiry "shall extend to the questions [1] whether the respondent has proceeded without, or in excess of, jurisdiction; [2] whether there was a fair trial; and [3] whether there was any prejudicial abuse of discretion." ( Code Civ. Proc., § 1094.5, subd. (b).) An abuse of discretion can occur three different ways: (1) "the [Director] has not proceeded in the manner required by law," (2) the "decision is not supported by the findings," or (3) "the findings are not supported by the evidence." (Ibid .)
Generally, one of two different statutory standards govern challenges to the sufficiency of the evidence supporting a final administrative decision. The appropriate standard is determined by whether the superior court is authorized to exercise its independent judgment on the evidence. ( Code Civ. Proc., § 1094.5, subd. (c).) Here, neither party contends the superior court was authorized to exercise its independent judgment. Therefore, the reviewing court must determine whether the findings are "supported by substantial evidence in light of the whole record." (Ibid .)
*881 B. Regulation of Pesticides
Pesticides are regulated by both the federal government and the State of California. In 1947, Congress enacted the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA; 7 U.S.C. § 136 et seq. ) to centralize registration and promote the accurate labeling of pesticides. (Joiner, Bates v. Dow Agrosciences LLC: The Beginning of the End of the "Era of Irresponsibility" (2006) 33 So.U. L.Rev. 361, 363-364.) In 1972 Congress transformed FIFRA from a labeling act to a comprehensive regulatory statute. (Joiner, supra , at p. 364.) The changes included granting the EPA the responsibility of enforcing FIFRA and the authority to determine whether a pesticide could be registered and sold in the United States. (Joiner, supra , at pp. 364-365.)
FIFRA expressly allows states to "regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by [FIFRA]." ( 7 U.S.C. § 136v(a).) To promote uniformity, states shall not impose labeling or packaging requirements different from those required by FIFRA. ( 7 U.S.C. § 136v(b).) In accordance with the provisions of FIFRA, the California Legislature has enacted a statutory scheme for the regulation of pesticides.
1. Registration in California
A pesticide cannot be sold in California unless the product's label is registered with the Department.[5] ( § 12993.)
*163 The purposes of the pesticide registration requirements are to (1) provide for the proper, safe, and efficient use of pesticides essential for (a) production of food and fiber and (b) protection of the public health and safety; (2) protect the environment by regulating or ensuring proper stewardship of pesticides; (3) assure safe working conditions for agricultural and pest control *882 workers; (4) assure users that pesticides are properly labeled and are appropriate for the use designated by the label; and (5) assure users that information on pesticidal use of the product disseminated by state or local government is consistent with the uses for which the product is registered. (§ 11501.)
Before a pesticide can be registered in California, it must first be registered by the EPA. ( Pesticide Action Network North America v. Department of Pesticide Regulation (2017) 16 Cal.App.5th 224, 232-233, 224 Cal.Rptr.3d 591.) Compliance with FIFRA and its registration requirement has been described as "extremely expensive and time consuming." (Hansen, Agricultural Nonpoint Source Pollution: The Need for an American Farm Policy Based on an Integrated Systems Approach Recoupled to Ecological Stewardship (1994) 15 Hamline J. Pub. L & Pol'y 303, 320.)[6] After the EPA has registered a pesticide, it is eligible for the Department's review. ( Pesticide Action Network , supra , at p. 233.) The Department is charged with thoroughly evaluating the pesticide to ensure that, when used in conformance with its labeling, it is effective and will not harm human health or the environment. (Ibid .; § 12824.)
To summarize, the federal pesticide regulatory program and the state program require sequential registration of a product the Department has decided is a "pesticide." This registration process is slow and expensive.
2. Statutory Definitions
California's definition of "pesticide" includes (1) any "spray adjuvant" and (2) any substance or mixture "intended to be used for [ (a) ] defoliating plants, [ (b) ] regulating plant growth, or [ (c) ] for preventing, destroying, repelling, or mitigating any pest ... which may infest or be detrimental to vegetation, man, animals, or households, or be present in any agricultural or nonagricultural environment whatsoever." (§ 12753.) In comparison, FIFRA defines "pesticide" to mean "(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any pest, (2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or desiccant, and (3) any nitrogen stabilizer," subject to certain exceptions that are not relevant here. ( 7 U.S.C. § 136(u).) Thus, the federal definition does not include "spray adjuvants" and California's definition does not include nitrogen stabilizers.
*883 For purposes of this appeal, two significant components of the definition of "pesticide" are (1) the term "spray adjuvant" and (2) the phrase "regulating plant growth." " 'Spray adjuvant' means any wetting agent, spreading agent, deposit builder, adhesive, emulsifying agent, deflocculating agent, water modifier, or similar agent, with or without toxic properties of its own, which is intended to be used *164 with another pesticide as an aid to the application or effect of the other pesticide, and sold in a package that is separate from that of the pesticide other than a spray adjuvant with which it is to be used." (§ 12758.)
" 'Regulating plant growth' [generally] means the use of any substance or mixture of substances intended, through physiological action, for accelerating or retarding the rate of growth or rate of maturation, or for otherwise altering the behavior of plants or the produce thereof." (§ 12756.) The statute also sets forth two exceptions to this general rule. First, the phrase "shall not include the use of substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments." (Ibid .) Second, " 'regulating plant growth' shall not be required to include at all the use of any of such of those nutriment mixtures or soil amendments as [1] are commonly known as vitamin-hormone horticultural products, intended for improvement, maintenance, survival, health, and propagation of plants and [2] are not for pest destruction and [3] are nontoxic, nonpoisonous in the undiluted packaged concentration."
The phrase "intended to be used" is not defined by the Food and Agricultural Code, but is defined in the regulations implementing the pesticide regulatory program. (Regulation 6145.) The definition can be satisfied in three different ways:
"(a) A person who distributes or sells the substance claims, states, or implies, by labeling or otherwise, that: [¶] (1) the substance, either by itself or in combination with any other substance, can or should be used as a pesticide; or [¶] (2) the substance consists of or contains an active ingredient and can be used to manufacture a pesticide; or
"(b) A person who distributes or sells the substance has actual or constructive knowledge that the substance will be used, or is intended by the user to be used, as a pesticide; or
"(c) The substance consists of or contains one or more active ingredients and has no significant commercially valuable use as distributed or sold other than: [¶] (1) use as a pesticide, by itself or in combination with any other substance; or [¶] (2) use in the manufacture of a pesticide." (Regulation 6145.)
*884 The first two definitions are based on intent. The third definition is based on the ingredients and does not involve the intent of the seller or the intent to the user.
3. Interpreting Regulation 6145
The parties disagree as to the proper interpretation of subdivision (c) of Regulation 6145. Caltec contends the phrase "has no significant commercially valuable use" refers to the "substance" and not to "one or more active ingredients." (Regulation 6145, subd. (c).) On appeal, the Department contends the third definition of "intended to be used" (Regulation 6145, subd. (c) ) allows for the intended use of a substance to be demonstrated by the presence of "active ingredients" and, so long as an active ingredient's only significant commercially valuable use is as a pesticide, the actions or mental state of the distributor or seller are irrelevant.[7]
*165 We conclude the words and grammar of subdivision (c) of Regulation 6145 are not ambiguous on the question of whether the phrase "has no significant commercially valuable use" refers to the "substance" or, alternatively, refers to "one or more active ingredients." The phrase refers to the "substance," that is the product being sold or distributed. Accordingly, to establish a product is a pesticide under the ingredients-based definition in subdivision (c) of Regulation 6145, the Department must prove the "substance [1] consists of or contains one or more active ingredients and [2] has no significant commercially valuable use as distributed or sold other than" use as a pesticide. The use of the conjunction "and" clearly establishes that the substance must satisfy two elements. ( In re C.H. (2011) 53 Cal.4th 94, 101, 133 Cal.Rptr.3d 573, 264 P.3d 357 [ordinary and usual usage of statutory term "and" is as a conjunctive, meaning an additional thing, also, or plus].) If the reference to the absence of commercial value had been intended to modify the phrase "one or more active ingredients," the words "and has" would have been replaced with "that have" or "having." (See Surfrider Foundation v. California Regional Water Quality Control Bd. (2012) 211 Cal.App.4th 557, 576, 149 Cal.Rptr.3d 763 [courts must interpret statutes consistent with the meaning derived from its grammatical structure].)
*885 The interpretation of subdivision (c) of Regulation 6145 advocated by counsel for the Department on appeal cannot be adopted by this court because it is contrary to the unambiguous language of the regulation. Thus, that interpretation, in effect, rewrites the regulation. To be valid, such a rewriting (i.e., amendment) of the regulation must be adopted in substantial compliance with the procedures of the Administrative Procedures Act ( Gov. Code, § 11340 et seq. ). (See Patterson Flying Service v. Department of Pesticide Regulation (2008) 161 Cal.App.4th 411, 429, 74 Cal.Rptr.3d 290 ["underground regulation" is not adopted in compliance with Administrative Procedures Act and, thus, is invalid].)
Based on the foregoing interpretation, the critical facet of the regulatory definition of "intended to be used" is set forth in subdivision (a)(1) of Regulation 6145. That definition is satisfied when the company selling or distributing the substance claims, states, or implies that the substance can or should be used as a pesticide. Under this definition, a company must be careful in marketing a product because claims about its capabilities, even if inaccurate, could cause that product to be subject to the pesticide regulatory program.
C. Auxins and Cytokinins
As part of his investigation, Chowdhury printed a page from a Web site at http://www.kelpak.com/activity/how_it_works.html on June 10, 2013. The page describes auxins and cytokinins as follows:
"Auxins are natural plant hormones produced in a plant's shoot tips and translocate downwards. One of its effects is to signal a plant to increase its root growth.
"Cytokinins are natural plant hormones produced in root tips and translocated upwards. One of its effects is to signal a plant to produce more and larger foliage."
*166 The subject of plant growth regulators is addressed in part II of chapter 15 of Anderson & Simon, Defending Pesticides in Litigation (2018) (Defending Pesticides ). Section 15:34 of Defending Pesticides states that "[i]n 1934, auxins were found to enhance root formation in cuttings." Section 15:35 of Defending Pesticides states: "Auxins are compounds that induce elongation in shoot cells. Some occur naturally, whereas others are manufactured. Auxin precursors are materials that are metabolized to auxins in plants." It also states the mechanism of action is not completely understood, but with the addition of auxin the individual cells become larger by a loosening of the cell *886 wall, which is followed by increased water uptake and expansion of the cell wall. Auxins include the herbicide 2,4-D.[8]
Section 15:37 of Defending Pesticides describes cytokinins as "naturally occurring or manufactured compounds that induce cell division in plants." It also states cytokinins were discovered in 1955 and have two notable effects in plants-that is, "the induction of cell division and the regulation of differentiation in removed plant parts." Section 15:34 of Defending Pesticides states that six classes of plant growth regulators are recognized by the American Society for Horticultural Science, including auxins, gibberellins, cytokinins and ethylene generators.
II.-III.**
IV. TERRA TREAT
A. Background
1. Administrative Decision
Part F of the analysis section of the Decision states there is ample evidence to support the Department's assertion "that Terra Treat is a spray adjuvant that Caltec claimed could be used to disburse other pesticides into the soil." The evidence includes a label that described Terra Treat as a soil surfactant/penetrant designed to uniformly distribute fertilizer, pesticides and/or water throughout the root zone. Based on invoices for seven sales of Terra Treat, the Department fined Caltec a total of $7,000-that is, $1,000 for each sale of the unregistered pesticide.
2. Terra Treat's Certification
The March 2015 declaration of Caltec's president and owner states Caltec held a certificate of registration for fertilizing materials from the DeptAg that listed Terra Treat as an "Auxiliary Soil and Plant Substance." A copy of the certificate of registration is attached to the declaration. The declaration states Caltec has held a certificate of registration for Terra Treat since approximately 1995.
*887 B. Statutory Construction
1. Contentions of the Parties
Caltec contends that because Terra Treat is registered with the DeptAg as an "auxiliary soil and plant substance" and the statutory definition of "auxiliary soil and plant substance" excludes pesticides (§ 14513), it follows that Terra Treat is not a pesticide. Caltec argues California's two statutory schemes relating to fertilizing materials and pesticides must be read together and the term "pesticide" given the same meaning in each scheme. In Caltec's view, the statutory language evinces an *167 intent to avoid the duplicative regulation of auxiliary soil and plant substances as pesticides, and vice versa. This argument suggests that Caltec regards the DeptAg's registration of Terra Treat as an auxiliary soil and plant substance is a final administrative determination that Terra Treat is not a pesticide under section 12753.
The Department argues the term "pesticide" used in the exception to the statutory definition of auxiliary soil and plant substance does not have the same meaning as the term "pesticide" defined in section 12753. In the Department's view, which was adopted in the Decision, section 14513's exclusion used the term "pesticide" in its ordinary sense, rather than in the technical sense set forth in section 12753. Under this statutory interpretation, it is possible for a product to be a pesticide under the technical elements of section 12753 and also be an auxiliary soil and plant substance under the statutory scheme governing fertilizing materials.
2. Statutory Text
Chapter 5 of division 7 of the Food and Agricultural Code governs fertilizing materials and contains provisions for licensing sellers, registering products, labeling, inspections, and procedures for prosecuting violations. (§§ 14501-14682.) In contrast, chapter 2 of the same division governs pesticides. (§§ 12751-13192.)
"Fertilizing materials" is defined as "any commercial fertilizer, agricultural mineral, auxiliary soil and plant substance, organic input material, or packaged soil amendment." (§ 14533.) Each component of this definition, in turn, is defined by statute. (§§ 14522 [commercial fertilizer], 14512 [agricultural mineral], 14513 [auxiliary soil and plant substance], 14550.5 [organic input material], 14552 [packaged soil amendment].) "Auxiliary soil and plant substance" includes, without limitation, (1) substances applied to soil for corrective purposes; (2) substances intended to improve desirable characteristics in plants, such as germination, growth or yield; and (3) substances intended to produce chemical, biological or physical change in soil.
*888 (§ 14513.) The statute also provides that the term "auxiliary soil and plant substance" "does not include commercial fertilizers, agricultural minerals, pesticides , soil amendments except biochar, or manures." (§ 14513, italics added; see § 14545 [manure].) In comparison, the statutory definitions of "pesticide" and "spray adjuvant" do not contain an exclusion for "auxiliary soil and plant substance." (See §§ 12753, 12758.) The parties dispute how these statutory definitions fit together.
3. Meaning of the Word "Pesticide"
For purposes of this opinion, we assume without deciding that Caltec has properly interpreted the statutory scheme and the term "pesticide" appearing in section 14513's exclusion has the same meaning as the term "pesticide" defined by section 12753. Under this assumption, if a material qualifies as a "pesticide" subject to regulation under chapter 5 of division 7 of the Food and Agricultural Code, it is not an "auxiliary soil and plant substance" subject to regulation under the chapter governing fertilizing materials because of the exclusion in section 14513.
4. Impact of Terra Treat's Registration
The next legal question presented is whether the DeptAg's registration of Terra Treat as an "auxiliary soil and plant substance" means Terra Treat is not a "pesticide" subject to regulation by the Department under chapter 2 of division 7 of the Food and Agricultural Code. Based on the circumstances of this case, we conclude the registration does not prevent *168 Terra Treat from being a pesticide subject to regulation by the Department.
The definition "auxiliary soil and plant substance" excludes "pesticides." (§ 14513.) In comparison, the definition of "pesticides" set forth in section 12753 does not exclude "auxiliary soil and plant substance" or the broader term "fertilizing materials." When these provisions are read together, the classification of a material as a "pesticide" precludes it from also being classified as an "auxiliary soil and plant substance."
Here, the sequence of the determinations was different. Terra Treat was registered as an "auxiliary soil and plant substance" before the Department determined it was a "pesticide." As a result, the narrow question presented is whether the DeptAg's registration of Terra Treat as an "auxiliary soil and plant substance" precludes the Department from subsequently determining Terra Treat was a "spray adjuvant" under section 12758 and, thus, a "pesticide" under section 12753.
Caltec's argument is the equivalent of claiming that the DeptAg's registration is a binding determination that Terra Treat is not a "pesticide." The *889 parties have not analyzed the issue from this perspective. For instance, they have not set forth any rules of law that identify when a determination by one administrative agency is binding upon another administrative agency. One set of legal rules addressing this topic is the doctrine of collateral estoppel, as modified for administrative decisions.
"For an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character. [Citation.] Indicia of proceedings undertaken in a judicial capacity include a hearing before an impartial decision maker; testimony given under oath or affirmation; a party's ability to subpoena, call, examine, and cross-examine witnesses, to introduce documentary evidence, and to make oral and written argument; the taking of a record of the proceeding; and a written statement of reasons for the decision." ( Pacific Lumber Co. v. State Water Resources Control Bd. (2006) 37 Cal.4th 921, 944, 38 Cal.Rptr.3d 220, 126 P.3d 1040.) Here, the DeptAg's registration of Terra Treat did not possess a judicial character and, therefore, the registration has no collateral estoppel effect on the Department.
In the absence of any other legal doctrine supporting the conclusion that the Department is bound by the DeptAg's registration, we conclude the registration of Terra Treat as an "auxiliary soil and plant substance" did not preclude the Department from determining Terra Treat was also a pesticide subject to regulation under chapter 2 of division 7 of the Food and Agricultural Code. Therefore, the Department did not act in excess of its jurisdiction for purposes of subdivision (b) of Code of Civil Procedure section 1094.5.
C. Sufficiency of the Evidence
Caltec also contends the evidence is insufficient to support the Department's finding that Terra Treat was a spray adjuvant. We disagree.
1. Documents in Administrative Record
Caltec asserts that "Terra Treat is a soil wetting agent that is intended to be applied to soil to improve water penetration." One of the documents cited by Caltec to support this assertion states that "managers often experience problems getting irrigation water to effectively and efficiently penetrate soil" (boldface and italics omitted) and explains that the surface tension of water may prevent it from physically penetrating the soil surface and root zone. The document then states:
*169 "The surfactants in Terra Treat Soil Penetrant are specifically designed to improve the spreading and penetration of water applied through irrigation *890 systems. Injecting Terra Treat into irrigation system reduces the surface tension of water, which facilities penetration of irrigation water.
"Terra Treat surfactant molecules in the irrigation water also attach to the water repellent 'coating' on thatch material and on the soil surface. This increases the adhesion between applied water and these surfaces....
"The net effect of reduced surface tension and increased adhesion of applied water at the water thatch and water soil interface will enhance spreading and penetration into the soil and root profile.
"The improved pattern of penetration, spreading, and hydration allows water to move more quickly and more efficiently into the soil. Reduction of water loss due to efficiently into the soil. Reduction of water loss due to surface evaporation and run-off can be expected."
The second page of the document asks, "EVER WONDER WHERE YOUR WATER AND PESTICIDES WENT?" That page states Terra Treat distributes water laterally and uniformly beneath the soil surface 8 to 12 inches deep. It also states Terra Treat can be applied through drip, flood, furrow, micros, or sprinklers and added with soil pesticides.
The label for Terra Treat appears in the administrative record at pages 1387 to 1388 and 1509. Each version of the label states: "A SOIL SURFACTANT/PENETRANT DESIGNED TO UNIFORMLY DISTRIBUTE FERTILIZER, PESTICIDES, AND/OR WATER THROUGHOUT THE ROOT ZONE."
A technical information sheet dated May 2011 for Terra Treat states: "SIGNIFICANTLY INCREASES THE EFFECTIVENESS OF SOIL-INJECTED, BAND-APPLIED LIQUID FERTILIZERS, INSECTICIDES, FUMIGANTS AND HERBICIDES." The technical information sheet includes the following entry: "Chemistry : Non-ionic, polyol soil wetting agent."[13]
2. Application of Statutory Definition of "Spray Adjuvant"
The statutory elements of a "spray adjuvant" are (1) any wetting or similar agent, (2) intended for use with another pesticide, (3) "as an aid to the application or effect of the other pesticide," (4) which is sold in a separate package. (§ 12758.)
*891 Terra Treat easily satisfies the first and fourth elements. Caltec's opening brief states "Terra Treat is a soil wetting agent" and the phrase "soil wetting agent" appears in the technical information sheet dated May 2011. As to packaging, the labels in the record demonstrate Terra Treat is sold in separate containers or packaging rather than being premixed by Caltec with other substances, such as fertilizers or other pesticides.
As to the second and third elements, Caltec contends "there is nothing in the record demonstrating that Terra Treat is intended to be used with other pesticides to improve the efficacy of the other pesticide ." One shortcoming of this argument is that it overlooks part of the statutory definition.[14] The definition is not limited to *170 agents that aid the effect (i.e., improve the efficacy) of another pesticide. It also covers agents that are "an aid to the application ... of the other pesticide." (§ 12758, italics added.) Terra Treat's label states it is capable of uniformly distributing pesticides throughout the root zone. This statement about uniform distribution is sufficient to support the factual finding that Terra Treat is an aid to the application of pesticides. Accordingly, the third element has sufficient evidentiary support.
As to whether Terra Treat is intended for use with another pesticide, the regulatory definition of "intended to be used" is satisfied when the seller of a substance claims or states, by labeling or otherwise, that the substance, by itself or in combination with any other substance, can be used as a pesticide. (Regulation 6145, subd. (a)(1).) A claim that a substance can "be used as a pesticide" necessarily includes the more specific claim that the substance can be used as a spray adjuvant because the statutory definition of "pesticide" includes "spray adjuvant." (§ 12753.) Here, Caltec has claimed that Terra Treat can be used as a spray adjuvant by stating it was designed to uniformly distribute pesticides throughout the root zone.
Consequently, we conclude that there is sufficient evidence to support the finding that Terra Treat is a wetting agent, sold in separate packaging, and intended to be used as an aid to the application of other pesticides. Accordingly, the Department's findings and conclusions as to Terra Treat, along with the fine of $7,000, shall be upheld.
*892 V. KELPAK
A. Background
1. Violations Alleged
The Notice of Proposed Action alleged Kelpak, as a plant growth regulator, is a pesticide product. It also alleged (1) Caltec had sold Kelpak in California a total of 282 times from June 1, 2010, through June 30, 2014; (2) the sales totaled $4,165,862.50; (3) during that period, Kelpak was not registered as a pesticide in California; and (4) the sales of the unregistered Kelpak violated section 12993. The Notice of Proposed Action stated the Department sought a penalty of $2,000 per sale, which totaled $564,000.
2. The Decision
The Decision states that (1) pesticides include plant growth regulators, (2) auxins and cytokinins are plant growth regulators, and (3) Kelpak is a liquid auxin concentrate and, therefore, a plant growth regulator. The Decision acknowledged Caltec's factual assertions that Kelpak is derived solely from edible seaweed, does not include added plant hormones, and is registered as an organic input material with the DeptAg. The Decision stated: "Auxins in seaweed are plant hormones which in un-concentrated form is possibly a fertilizer. But in concentrated form seaweed auxins are probably plant growth regulators or pesticides, not fertilizers."[15]
The Director imposed the penalty recommended in the Notice of Proposed Action. Thus, Caltec was fined $2,000 for *171 each of the 282 sales of Kelpak that violated section 12993, or a total of $564,000.
B. Evidence Presented
1. Documents
Caltec's invoices for its sales of Kelpak include a box labeled "Description." The entries in this box describe Kelpak as a "Liquid Auxin Concentrate." Kelpak's label describes it as a "Liquid Seaweed Concentrate" and an "Organic Plant Nutrient." The label includes a logo stating it is a material registered with the Washington State Department of Agriculture for use in organic agriculture. The label also directs users to refer to the Kelpak Application Guide for specific crop recommendations.
*893 A "Kelpak Guide Manual" included in the administrative record contains sections for (1) product specifications and (2) mode of action and responses. The product specifications state the active ingredients are "Natural Auxins 11 mg / litre" and "Natural Cytokinins 0.031 mg / litre." The first two paragraphs of the section labeled "MODE OF ACTION AND RESPONSES" state:
"Kelpak is a plant bioregulator made from the seaweed species Ecklonia maxima (commonly known as kelp), and found in the cold waters of[f] the South African West Coast. This species has a prolific growth rate, due mainly to the presence of the plant hormone groups auxins and cytokinins. The cell sap containing these hormones is extracted from freshly-harvested kelp with the unique cell burst technology, patented worldwide. No heat, freezing or harsh chemicals are used to break the cell walls in the extraction process. This ensures that the delicate compounds found in the kelp are maintained in their active form in Kelpak. The natural high auxin to low cytokinin ratio in the fresh kelp is therefore maintained in the end product. The Institute of Marketecology (IMO), BCS Oko-Garantie, The UK Soil Association, Australian Biological Farmers and SGS have accredited this organic product for use in organic agriculture.
"This auxin-dominated extract stimulates prolific adventitious root formation when Kelpak is applied to almost any plant. This drastic increase in root tips leads to an increased level of cytokinins in treated plants, as this group of hormones is mainly produced in root tips. The increased root volume and number of root tips also increases moisture and nutrient uptake from the soil. The improved nutrient status, together with the higher level of cytokinin in the plant, gives better top growth which causes the increase in yield and quality of crops. The improved root system also makes the plant more resistant to stresses such as drought, waterlogging, soil nutrient deficiency and salinity, nematode infestations and soil-borne diseases."
The last paragraph in this section refers to Kelpak "as a cost effective agricultural biostimulant." A June 2010 Kelpak Guide for new plantings, trees and vines, includes the line: "Use Kelpak auxin concentrate plant growth regulator as follows." This guide includes Caltec's name, address and phone numbers. Caltec's 2008 product guide lists Kelpak under the heading "Auxin Concentrate."
Exhibit D to the investigation summary prepared by Chowdhury was a September 13, 2012, press release issued by the EPA. The press release announced three enforcement actions by the EPA against Missouri pesticide distributors involving the sale of plant growth regulators, which are regulated as pesticides under FIFRA. The release stated: "FIFRA defines plant growth *894 regulators as substances intended to accelerate or retard the growth of plants. Among other things, substances *172 considered to be plant regulators may include hormone additives intended to stimulate plant root growth or fruiting, such as gibberellins, auxins, and cytokinins derived from seaweed. Products containing these additives are often marketed as fertilizers, but such claims do not exempt products from regulation as pesticides."
2. Caltec's Evidence
The March 2015 declaration of Caltec's owner states Caltec holds a certificate of registration for organic input material from the DeptAg for Kelpak liquid seaweed concentrate and includes a copy of the certificate. Also attached to the declaration is a copy of a material registration certificate from the Washington State Department of Agriculture, which states Kelpak has "been verified to comply with the USDA National Organic Standards (7 CFR Part 205)."
Caltec submitted a March 2015 declaration of Adriaan Francois Lourens, Ph.D. Dr. Lourens obtained a Ph.D. in plant physiology from the University of California, Davis and bachelor's and master's degrees from the University of Stellenbosch, South Africa. Dr. Lourens works for Kelp Products (Pty) Ltd., the company that developed and manufactures Kelpak. Dr. Lourens's declaration asserts Kelpak (1) is derived entirely from the edible seaweed species Ecklonia maxima , (2) is nontoxic, (3) includes soluble potash (K2 O) and lower levels of calcium and magnesium, and (4) contains no hormone additives. The declaration also asserts "Kelpak was developed with the sole intention that it be sold and used as an organic plant nutrient."[16]
Dr. Lourens's declaration states: "All seaweed species naturally contain varying amounts of auxins and cytokinins, plant hormones that are necessary to the normal growth of plants. Similarly, Ecklonia maxima has naturally-occurring auxins and cytokinins, with the auxin levels being higher than cytokinin levels." The declaration also states the levels of auxin and cytokinin listed on Kelpak's label-11 mg/liter and 0.03 mg/liter-were obtained from a typical bioassay for auxin-like and cytokinin-like activity and then asserts: "These values of auxins and ctyokinins were later found to be a gross over-estimation of what were found by high technology physical analyses of *895 the product." The declaration does not state how the timing of these later analyses relates to the period covered by the Notice of Proposed Action. In particular, it does not state when the analyses were completed or describe how the new information affected the labeling and marketing of Kelpak, if at all.[17] Thus, the new information about grossly over-estimated auxin levels is not linked to what Caltec stated or implied about Kelpak in connection with the 282 sales that are the subject to the Notice of Proposed Action. (See Regulation 6145, subd. (a).)
Caltec also submitted a March 2015 declaration of Roy Slack, the current managing director of Kelp Products (Pty) Ltd., *173 which states he is responsible for the development of Kelpak's North America markets. Slack's declaration states that since Kelpak distribution began in the United States, neither the EPA nor any state other than California has characterized Kelpak as a pesticide. Slack's declaration also states Kelpak is registered as an organic input material with the DeptAg and, to maintain this specific type of registration, additional fees must be paid and labeling requirements satisfied.
C. Kelpak's Registration as an Organic Input Material
It is undisputed that Kelpak is registered with the DeptAg as an organic input material. Section 14550.5 defines "organic input material" as "any bulk or packaged commercial fertilizer, agricultural mineral, auxiliary soil and plant substance, specialty fertilizer, or soil amendment, excluding pesticides , that is to be used in organic crop and food production and that complies with" certain national organic standards contained in the Code of Federal Regulations. (Italics added.) This definition, like the definition of "auxiliary soil and plant substance" set forth in section 14513, excludes "pesticides."
Caltec argues that Kelpak is not a plant growth regulator and, thus, is not a pesticide because the DeptAg has registered Kelpak as an organic input material. First, on the question of statutory interpretation, we conclude the Legislature intended "pesticide" to mean the same thing in section 14550.5 as it does in sections 12753 and 14513. Second, as in our analysis of Terra Treat, we conclude the DeptAg's determination that a substance is a particular type of fertilizing material with a definition that excludes pesticides is not a final and binding determination that the material is not a pesticide. Consequently, Kelpak's registration as an organic input material does not preclude the Department from determining it is a pesticide.
*896 D. Sufficiency of the Evidence
First, Caltec argues the record does not contain sufficient evidence to support the finding that all types of cytokinins and auxins, regardless of their intended use or physical composition, are plant growth regulators and pesticides. This argument need not be discussed in detail because the Decision does not contain such a broad finding. Instead, the Decision clearly states Kelpak is a liquid that concentrates the auxins contained in seaweed and was intended for use as a liquid auxin concentrate . Thus, the Decision does not relate to all types of auxins, whether or not they are concentrated.
Second, Caltec argues substantial evidence does not support the finding that seaweed auxins in concentrated form are probably plant growth regulators and are not fertilizers. The Decision made the general observation that "in concentrated form seaweed auxins are probably plant growth regulators, not fertilizers." Then, the Decision addressed the specific question presented by the sales of Kelpak by stating "Caltec sold Kelpak as a Liquid Auxin Concentrate on each invoice-a plant growth regulator and not a plant nutrient."
Substantial evidence supports the explicit finding that Caltec sold Kelpak as a liquid auxin concentrate. Caltec's invoices contain that description of Kelpak. The invoices do not state Kelpak contains any primary plant nutrient, any secondary plant nutrient, or any micronutrients.[18]
*174 Thus, the description in the invoices supports the inference that Kelpak is intended to be used as an auxin concentrate, rather than intended to supply a plant nutrient not mentioned in the label or invoice.[19] In addition, Caltec's 2008 product guide lists Kelpak as an auxin concentrate. The product specifications given in a Kelpak guide manual state the active ingredients in Kelpak are natural auxins (11 mg/liter) and natural cytokinins (0.031 mg/liter). These figures are consistent with the information provided in Dr. Lourens's declaration. These documents constitute substantial evidence that Kelpak was intended to be used as an auxin concentrate.
Substantial evidence also supports the finding that, as a liquid auxin concentrate, Kelpak was sold as a plant growth regulator. The Kelpak Guide *897 Manual includes a section labeled "MODE OF ACTION AND RESPONSES" that describes Kelpak as "a plant bioregulator made from the seaweed species Ecklonia maxima "; an "auxin-dominated extract"; and "a cost effective agricultural biostimulant." Moreover, Caltec's June 2010 Kelpak guide for new plantings, trees and vines, uses the phrase "Kelpak auxin concentrate plant growth regulator." Besides the explicit use of the term "plant growth regulator," the use of the terms "plant bioregulator" and "agricultural biostimulant" reasonably support the inference that Kelpak was sold as a plant growth regulator and not a plant nutrient. Furthermore, Caltec's argument that the weight of the evidence supports a finding that Kelpak was intended to be used as an organic input material and plant nutrient is off point, because the applicable test for reviewing the evidence is the substantial evidence standard, which does not allow a reviewing court to reweigh the evidence in the record. (See Montebello Rose Co. v. Agricultural Labor Relations Bd. (1981) 119 Cal.App.3d 1, 21, 173 Cal.Rptr. 856 [power of appellate court reviewing findings of a lower tribunal begins and ends with determining whether there is substantial evidence, contradicted or not, that supports the findings].) In short, the possibility that the trier of fact could have drawn other inferences from the evidence does not establish factual error. In sum, we conclude substantial evidence supports a finding that Kelpak is a mixture of substances "intended to be used for ... regulating plant growth" and, therefore, qualifies as a "pesticide" under section 12753. (See Regulation 6145, subd. (a).)
E.-F.***
DISPOSITION
The judgment is affirmed. Appellant's November 27, 2018, request for judicial notice of legislative history is granted. Respondents shall recover their costs on appeal.
I CONCUR:
MEEHAN, J.
POOCHIGIAN, Acting P.J., concurring,
I concur in the judgment but write separately to discuss several peculiarities of pesticide regulation in California.
*175 *898 I. Regulations Significantly Limit Fact-finders' Ability to Weigh Competing Indicia of Intent
In most contexts, the intent of an actor is determined by a finder-of-fact weighing conflicting inferences from various pieces of circumstantial evidence. As this case demonstrates, the concept of intent is also important in the realm of pesticide regulation. The statutory definition of pesticide includes any substance "intended to be used for" certain purposes (e.g., destroying or preventing pests, etc.) ( Food & Agr. Code, § 12753, subd. (b).)[1] By itself, this language would suggest a finder-of-fact can look to various factors to try to discern the intent of the seller in a particular transaction. However, attendant administrative regulations found at 3 California Code of Regulations section 6145 (Regulation 6145) severely limit the fact-finder's prerogative.
Under Regulation 6145, a substance is "considered to be 'intended to be used' " for a pesticidal purpose if any of the following three circumstances apply:
"(a) A person who distributes or sells the substance claims, states, or implies, by labeling or otherwise, that:
"(1) The substance, either by itself or in combination with any other substance, can or should be used as a pesticide; or
"(2) The substance consists of or contains an active ingredient and can be used to manufacture a pesticide; or
"(b) A person who distributes or sells the substance has actual or constructive knowledge that the substance will be used, or is intended by the user to be used, as a pesticide; or
"(c) The substance consists of or contains one or more active ingredients and has no significant commercially valuable use as distributed or sold other than:
"(1) Use as a pesticide, by itself or in combination with any other substance; or
"(2) Use in the manufacture of a pesticide." (Regulation 6145.)
*899 By using the disjunctive "or" between subdivision (a), (b), or (c), Regulation 6145 provides that if any one of the several factors applies, then the requisite "intent" is necessarily established. Thus, rather than allowing the finder-of-fact to weigh various evidentiary clues of intent and arrive at an independent conclusion, this administrative regulation stacks the deck against the seller. For example, say an organic farmer makes clear to a seller that he is purchasing an adjuvant solely to aid in application of an organic foliar fertilizer. The farmer, a longtime client of the seller, has never used pesticides and plans never to do so. Yet, somewhere on the adjuvant's label there is a notation that the adjuvant could be used to aid in application of fertilizers or pesticides . In that circumstance, Regulation 6145, subdivision (a)(1) would require a finding the adjuvant was "intended to be used" as an aid to application of a pesticide even though neither the seller nor the buyer had any such intent.
In sum, the circumstances listed in Regulation 6145, subdivision (a)(1) should be subsidiary factors in discerning the ultimate issue of intent, not independently-sufficient proxies for intent. As currently written, the regulation hinders fact-finders and makes it unduly difficult for sellers to rebut the issue of intent. It should be reevaluated by the Department of Pesticide *176 Regulation or addressed by the Legislature.
II. Permitting the Classification of a Substance as a Pesticide to Turn on Statements in Marketing Materials and Websites is Questionable
One of the factors in Regulation 6145 concerns representations by the seller. (Regulation 6145, subd. (a).) The provision provides that a seller is deemed to have intended a substance to be used as a pesticide if the seller "claims, states, or implies, by labeling or otherwise" that the substance can or should be used as a pesticide or can be used to manufacture a pesticide. (Ibid .) Indeed, this factor plays a central role in our holding today. Yet, the relevance of marketing materials and website descriptions in classifying a substance as a pesticide under the statute is questionable.[2] Because of their chemical properties, pesticides can pose threats to the safety of drinking water, farmworkers, farming families, and schoolchildren. (See, e.g., §§ 12980, 13141, 13182.) But a pesticide's chemical properties are not changed by the marketing materials that accompany them. It is peculiar, then, that the definition of pesticide can turn on whether marketing materials suggests it can or should be used in a particular manner.
For example, if Caltec had not indicated that Greenfeed is "compatible" with pesticides and can be a "carrier" for pesticides, then Greenfeed would *900 arguably not be considered a pesticide. Yet, whether Greenfeed poses a threat to human health is not impacted by its marketing materials.
Or, consider a seller who incorrectly believes a substance has pesticidal effects. The substance's labeling would result in a pesticide classification, even if it has no such qualities and is entirely harmless.
Unmooring the definition of a pesticide from a substance's chemical properties would not seem to further the goal of protecting public health or the environment.
III. It is Unclear Why Non-Toxic Adjuvants are Regulated as Pesticides
Adjuvants can be used in a variety of ways, not just pesticide application. ( Application of Lemin, 51 CCPA 942, 944-945, 326 F.2d 437 (1964).) Some adjuvants are labeled as multipurpose. Under current regulations, if just one of those purposes is to aid in the application of a pesticide, then the adjuvant itself is considered a pesticide. (See § 12758; Regulation 6145, subd. (a).) This is true even if the adjuvant has no "toxic properties of its own." (§ 12758.) It is unclear what government interest is furthered by regulating nontoxic adjuvants as pesticides. In contrast, the federal definition of pesticide in title 7 United States Code section 136(u) does not expressly include adjuvants. The Legislature may wish to consider reexamining whether nontoxic adjuvants should be removed from the definition of pesticide, consistent with the federal statute.
With these observations, I concur in the judgment.
Certified for Partial Publication.*

Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II., III., V.E., and V.F.

Subsequent unlabeled statutory references are to the Food and Agricultural Code.

On appeal, Caltec has not challenged the determination that Microlife was a pesticide.

The Department contends the notice was delivered to the offices of Caltec's attorney by certified mail on February 23, 2015, at 3:59 p.m. and cites information printed from the United States Postal Service's tracking Web site.

Microlife's label described it as a "Nematode Suppressant."

The Department (i.e., DPR) is one of six agencies operating under the California Environmental Protection Agency. (§ 11451.) The California Environmental Protection Agency and the DPR were created in 1991 pursuant to the Governor's Reorganization Plan. (See Fernandez v. California Dept. of Pesticide Regulation (2008) 164 Cal.App.4th 1214, 1222, 80 Cal.Rptr.3d 418.) The DeptAg previously administered California's pesticide regulatory program, but the Governor's Reorganization Plan transferred the responsibility for that program to the DPR. (Ibid . ; § 11454.) The DPR and the DeptAg are separate agencies and do not share a common parent organization, a fact that has some relevance in determining the effect on the DPR of the DeptAg's decision to register a product as a fertilizing material.

"To register a pesticide, [EPA] requires the registration applicant to submit a large number of studies concerning the chemistry and toxicology of the pesticide, the potential risks it may pose to worker safety and public health, the effects it may have on the environment, fish, wildlife and non-target insects, and other studies that bear on the pesticides safety and effectiveness." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 124, as amended Jun. 11, 1996, p. 2.)

Neither the Director nor the hearing officer expressly interpreted subdivision (c) of Regulation 6145 to mean the phrase "has no significant commercially valuable use" refers to "one or more active ingredients" and not to the "substance." Generally, when an agency's interpretation is carefully considered by senior agency officials, it is entitled to correspondingly greater weight. (Allende v. Department of California Highway Patrol (2011) 201 Cal.App.4th 1006, 1018, 134 Cal.Rptr.3d 26.) In contrast, an argument advanced by the agency's litigating counsel is not regarded as an agency interpretation and, thus, is given less weight. (Ames v. Merrill Lynch, Pierce, Fenner & Smith, Inc. (2d Cir. 1977) 567 F.2d 1174, 1177, fn. 3 ; see 2B Singer & Singer, Statutes and Statutory Construction (7th ed. 2012) § 49:4, p. 85 ["arguments of an agency's counsel do not have the probative force of an official agency interpretation"].)

Section 14031 uses "2,4-D" to mean "any form of 2,4-dichlorophenoxyacetic acid." In 1949, the Legislature made 2,4-D a restricted material. (People ex rel. Deukmejian v. County of Mendocino (1984) 36 Cal.3d 476, 481, 204 Cal.Rptr. 897, 683 P.2d 1150 ; see Cal. Code Regs., tit. 3, § 6400, subd. (e) [2,4-D included in pesticides designated restricted materials].)

See footnote *, ante .

Thus, the documents describing Terra Treat are distinguishable from the documents describing Greenfeed in that Terra Treat is explicitly referred to as a wetting agent and no document describes Greenfeed as an "agent" of any sort.

A second shortcoming is Caltec's failure to address the Terra Treat technical information sheet dated May 2011 and its statement that Terra Treat significantly increases the effectiveness of soil-injected, band-applied insecticides, fumigants and herbicides. This statement is the equivalent of saying Terra Treat is "an aid to the ... effect of [a] pesticide." (§ 12758.)

A parenthetical citation immediately after this statement directs the reader to see the discussion in G & M Farms, Inc. v. Britz-Simplot Grower Solutions, LLC (E.D.Cal. May 28, 2013, No. 1:13-CV-0368 LJO MJS) 2013 WL 2360896, 2013 U.S. Dist. LEXIS 75458 (G & M Farms ).

We note that Dr. Lourens's declaration did not attach any of his journal articles discussing seaweed concentrate. (See Ferreira & Lourens, The efficacy of liquid seaweed extract on the yield of canola plants (2002) 19(3) S. Afr. J. Plant Soil 159, 161 ["Liquid seaweed concentrate (Kelpak) ... contains natural plant growth regulators that are high in auxins and low in cytokinins"; "Kelpak ... appeared to be an effective and consistent growth regulator for increasing canola yield"].) We have not relied on this or any other article authored by Dr. Lourens in deciding this appeal.

The new findings about Kelpak's (unspecified) auxin levels resulting from the high technology physical analyses did not affect Caltec's invoices from May 2014, which continued to describe Kelpak as a "Liquid Auxin Concentrate."

Nitrogen, available phosphoric acid, and soluble potash are primary plant nutrients. (§ 14556.) The secondary plant nutrients are calcium, magnesium and sulfur, alone or in combination. (§ 14559.) " 'Micronutrients' means boron, chlorine, cobalt, iron, manganese, molybdenum, sodium, or zinc, alone or in any combination." (§ 14546.)

Under section 12756, the definition of regulating plant growth does "not include the use of substances to the extent that they are intended as plant nutrients, trace elements, nutritional chemicals, plant inoculants, and soil amendments." Here, the Director was not compelled by the evidence to find that the intended use of Kelpak was as a plant nutrient. As a result, the Director's determination that the exception did not apply to Kelpak does not constitute error.

See footnote *, ante .

All further statutory references are to the Food and Agricultural Code unless otherwise stated.

Such materials are-and should remain-relevant to other issues, such as whether the seller has "misbranded" the substance. ( 12881, et seq.)